Charles T. Marshall, Esq. (Bar No. 176091)
LAW OFFICE OF CHARLES T. MARSHALL
415 Laurel Street, #405
San Diego, California 92101
Telephone: 619-807-2628
Facsimile: 866-575-7413

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIFE SAVERS CONCEPTS ASSOCIATION, INC.; LUPITA CHAVEZ; RITO CHAVEZ; RAQUEL CHAVEZ; ESEQUIEL LOMBERA,<br><br>Plaintiffs,<br><br>v.<br><br>ROAHN WYNAR; and DOES 1-100, inclusive,<br><br>Defendants. | Case No.  5:18-cv-02252-LHK<br><br>**FIRST AMENDED CIVIL RIGHTS COMPLAINT FOR DAMAGES PER 28 U.S.C. § 1331,** *BIVENS V. SIX UNKNOWN NAMED AGENTS OF FEDERAL BUREAU OF NARCOTICS*, **403 U.S. 388 (1971), AND 42 U.S.C. §§ 1983 & 1985; DEMAND FOR A JURY TRIAL** |

COME NOW Plaintiffs and Life Savers Concepts Association, Inc. ("Life Savers"), Lupita Chavez ("Lupita"), Rito Chavez ("Rito"), Raquel Chavez ("Raquel"), and Esequiel Emilio Valverde Lombera ("Esequiel") (collectively, "Plaintiffs") and allege the following on information and belief.

**BACKGROUND**

1.   In the midst of the financial crisis, in July 2012, Reverend Nigel Johnson ("Johnson") started Life Savers to help low-income and disenfranchised homeowners in and around Northern California to band together to fight mass foreclosures that were ravaging inner-city and largely minority neighborhoods.

2.   In July 2012, Life Savers Concept Association, Inc. was incorporated as a North Carolina corporation and then registered with the California Secretary of State to do intrastate

business in California. Reverend Johnson is the president of Life Savers. His ministry is nondenominational, uses the name Lifehouse International Ministries, and is based in Stockton, California. Johnson and Life Savers members were fighting against the wholesale devastation of entire neighborhoods in places like Stockton, East Oakland, Richmond, Hayward and other Bay Area cities.

3. In pursuit of its mission, Life Savers entered into membership agreements with homeowners and former home owners so they could better seek relief from improper actions relating to their home loans and the real property securing the loans. Members transferred their claims (or the claims of their living trust) against the entities that made, held or serviced their home loans, to Life Savers by executing documents labeled "Agreement for Assignment and Transfer of Rights of Legal Claim," executed from February 14, 2013 through April 16, 2015. When the members executed the agreements for assignment and transfer of rights of legal claim, most also executed grant deeds that transferred to Life Savers a five percent ownership interest in the real property seeming their loans.

4. On March 29, 2013, Life Savers and its agent Larry Brown ("Brown") entered into an assignment agreement. One counterpart of this agreement was signed on behalf of Life Savers by Frank Benjamin, executive vice president. A second counterpart was signed on behalf of Life Savers by Johnson, president, and Dawn Burt, as vice president. The basic purpose of the agreement was to transfer to Brown all rights that had been assigned to Life Savers by the homeowners and former homeowners.

5. On August 13, 2014, and December 10, 2015, Life Savers executed a second and a third assignment that transferred to Brown all the rights to pursue claims that had been assigned to Life Savers. Contemporaneous with the second assignment of claims to Brown, Life· Savers executed a document that assigned "all of its interest in the Grant Deeds assigned it by all LifeSavers members" to Brown. Similarly, when Life Savers executed the third assignment to Brown, it also executed an assignment agreement that quitclaimed to Brown all of Life Savers' right, title and interest in the real property conveyed to Life Savers by the grant deeds from its

members. Based on these assignments, Brown claims to hold a 5 percent ownership interest in each of the properties that secured the home loans of the members.

6. Eventually this association proved so popular, that members joined from various parts of California. Life Savers members assigned their rights to Life Savers to bring suit against their lenders, who were wrongfully and improperly foreclosing on their properties, in state court. With each assignment a lawsuit was filed against the on behalf of the members assigning right to Life Savers and then to Brown. The various banks challenged Life Savers', and its agent Brown's, ability to bring suit on behalf of its members as assignee of their rights in chose. Recently the California Court of Appeal reviewed Life Savers' and Brown's assignments to sue on behalf of members and the aggregation of such rights in one lawsuit and determined that "California's rules of law concerning standing and assignments do *not* prohibit an assignee's aggregation of a large number of claims against a handful of defendants into a single lawsuit." *Brown v. Superior Court of Fresno (DOCX, LLC, et al.)*, Cal. Ct. of App. Case No. F073964 (Jan. 30, 2018) (emphasis added). Indeed footnote 8 of the Court's opinion acknowledged Brown got it right.

7. Notwithstanding, Life Savers' and Brown's legitimate activities, the Office of the Monterey County District Attorney (the "DA") and the Federal Bureau of Investigation (the "FBI") at various times, independently and in coordination, executed search warrants and committed offensive and illegal acts in violation of Life Savers', its members' and employees' Constitutional rights under the color of law. The overzealous execution of search warrants, improper statements to justifying the issuance of warrants harassing and defamatory conduct of agent Roahn Wynar was motivated by the urging of the defendants in the underlying cases Life Savers members filed against banks and other mortgage lenders under the pretext that Life Savers perpetrated a fraud against its members. After years of investigation (since at least 2014), convening a grand jury (in July 2017), and lawsuits, there have been no charges brought alleging fraud or any other crime by either the DA, the California Bureau of Real Estate or the FBI.

**JURISDICTION AND VENUE**

8. This case is brought pursuant to, *inter alia*, the First, Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution, *Bivens*,. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

9. This Court has jurisdiction under 28 U.S.C. § 1331; 28 U.S.C. § 1343; 28 U.S.C. § 1346; 28 U.S.C. § 2201; and 28 U.S.C. § 2202.

10. Venue is proper in the Northern District of California because a substantial part of the events complained of and giving rise to Plaintiffs' claims occurred in this District. *See* 28 U.S.C. §§ 1391(b), 1391(e), 1402(b).

## PARTIES

11. Plaintiff Life Savers Concepts Association, Inc. is a North Carolina corporation and registered to do business in the State of California.

12. Plaintiff Lupita Chavez is a natural person, over the age of eighteen, and a resident of the County of Santa Clara, City of Sunnyvale.

13. Plaintiff Rito Chavez is a natural person, over the age of eighteen, and a resident of the County of Santa Clara, City of Sunnyvale.

14. Plaintiff Raquel Chavez is a natural person, over the age of eighteen, and a resident of the County of Santa Clara, City of Sunnyvale.

15. Plaintiff Esequiel Emilio Valverde Lombera is a natural person, over the age of eighteen, and a resident of the County of Santa Clara, City of Sunnyvale.

16. Defendant Roahn Wynar ("Wynar"), at all times pertinent to the allegations of this complaint, an agent employed by the Federal Bureau of Investigation, is sued individually and in his official capacity.

17. Plaintiffs are unaware of the true names and capacities of the defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Defendants DOES 1 through 100 are responsible in some manner for the activities alleged herein and each was acting as an agent for the others. Plaintiffs will amend this Complaint to add the true names of DOES 1 through 50 once they are ascertained. Whenever

reference is made to Defendants, such reference shall include all defendants including DOES 1 through 100.

## GENERAL ALLEGATIONS

*A Monterey County DA Investigator Fishing in Santa Clara County*

18. On or about June 27, 2017, around 11:00 a.m., investigator Alicia Cox, not a defendant in this action, presented at Life Savers' Sunnyvale offices to inform Life Savers that it was "a victim of fraud! We think that thousands and thousands of dollars were stolen from Life Savers." At that meeting, she spoke with Brown for a couple of minutes. After which, he Brown instructed Life Savers employees to cooperate fully with investigator Cox. Cox stated she had 300 files she claimed were from Salinas area members, who had paid money to a Life Savers employee, Amparo Morales, who Cox claimed had taken cash payments from members and the money could not be found. The Sunnyvale employees checked 30 files, Cox provided, to determine if those members' fees had been remitted. It turned out that most of those 30 members' files did not require a membership fee, so no money was exchanged, and only four members payments were accounted for. Investigator Cox was surprised that there were no irregularities. She then remarked, "You guys are very well organized, you have very nice offices." She kept repeating, "You guys are very well organized."

*A Rogue Agent Takes Matters into His Own Hands*

19. Less than two weeks later, at approximately 9:20 a.m. on July 11, 2017, Wynar, along with several other FBI agents, executed a search warrant on Life Savers' Sunnyvale, California offices—the same office Cox visited just weeks ago. Wynar led his band of agents on a wild and egregious "raid" of Life Savers' offices, unlawfully arresting and detaining Life Savers' employees, roughing up and twisting arms, handcuffing and holding without permission to leave, yet without arrest, cursing at and intimidating clerical workers who also happened to reside in the adjoining residential quarters located in the offices.

20. Within just a few brief minutes Wynar's knocking turned to screaming, ordering Life Savers' employees to open the door and the entire scene turned chaotic. Employees Lupita

Chavez, Rito Chavez, and Raquel Chavez, who all reside in the adjoining living quarters were dressing or still in bed. Raquel ran to the front door to open it. When she opened the door, Wynar was screaming in her face and demanding to know what took so long to open the door.

21. Wynar then tried to open Raquel's office and Rito's office, both of which were locked and started asking why the doors to every office were locked and who was at the office. Raquel answered, that she was still in bed and the doors were locked because we open at 11:00 a.m. and it was only about 9:30 a.m. when Wynar and his agents arrived. She let Wynar know that there were three more people in the back offices.

22. Wynar demanded from Raquel, "Why were you sleeping here?!" She answered, "Because we live here." Wynar yelled, "You are telling me that you live here? You don't have another place to live?" She answered, "We live here." Wynar demanded, "You live here since when?!" Raquel replied, "For about three years." Wynar remarked, "Oh . . . I did not know that you live here."

23. At the same time, 30 agents rushed into the office with guns drawn and pointed at the employees. Wynar pulled out a folded piece of paper from his pocket and informed her that they were there to execute a search warrant for documents and computers related to Life Savers. But when Raquel extended her hand to inspect the search warrant, Wynar put the folded paper back in his pocket and said that he was going to give Raquel a copy later. Raquel asked if Wynar had an arrest warrant for any one, he answered no.

24. In a loud voice and threatening manner, Wynar demanded keys to all the offices. Raquel complied by delivering him a set of keys. Wynar then turned to another agent and said, "I don't have a set of handcuffs. Get me two sets of handcuffs." The other agent said that it was not necessary yet Wynar demanded, "Come on! Give me the handcuffs!" Immediately, Wynar grabbed employee Esequiel Lombera with great force, pushed him against the wall with force, twisted his arm, searched and handcuffed him with his hands behind his back and ordered him to face the wall. Wynar then demanded another set of handcuffs and went searching for Rito, grabbing him with excessive force, twisting his hands and handcuffing him with his hands behind his back and ordered him to face the wall, as well. At this time, approximately 20 more

agents came pouring into the office, with guns drawn and pointed at the employees, while the others started rummaging through every corner of the offices, including the living quarters where Raquel, Rito and Lupita lived.

25. The employees were scared and shocked, which caused Wynar to become impatient because they did not react or answer his questions immediately. Raquel informed Wynar that they were not answering his questions because he was asking too many questions too fast, the employees were scared, and Lupita and Rito only spoke Spanish so they could not understand what he was saying.

26. At this point, the employees were all terribly frightened. They were prevented from leaving, prevented from using their cell phones or the office phones, Rito and Esequiel remained handcuffed standing facing the wall, and others made to sit in one office for hours without being *Mirandized*. When Raquel requested to use the bathroom, Wynar told her she had to wait. After ten or fifteen minutes, Raquel again asked to use the bathroom since she had just awoken before the agents arrived and had no chance to use it previously, again Wynar told her she could not and would have to wait. After nearly one hour from the first request, Raquel requested a third time to use the bathroom. This time, over one hour later, after checking the bathroom trash can and water tank, Wynar allowed Raquel to use the restroom. By then, Rito and Esequiel had been handcuffed for over 30 minutes.

27. Sometime thereafter, Wynar released Rito and Esequiel and ordered all the employees to go to the front desk with him and "Arlette," an Internal Revenue Service agent. Raquel was ordered to sit down at one of the chairs. Wynar then instructed FBI agent Robert Kay to take Rito's, Lupita's and Esequiel's identification cards. As Rito was pulling his identification from his wallet, agent Kay grabbed Rito, demanding he show another form of identification besides his driver's license. Kay reached into Ritos's wallet while it was still in Rito's hand and pointed to Rito's green card. Rito handed both documents to Kay, which he then noted on his notepad.

28. When Rito, Lupita and Esequiel were instructed to leave, Raquel was prevented from leaving and told to sit down. At this time Rito was finally allowed to use the bathroom.

1  Rito after using the bathroom went to check on his wife hoping to remain with Raquel however
2  Wynar informed him that there was nothing to be worried about. "Everything is going to be fine
3  as long as she [Raquel] works with us and tells us the whole truth." As Rito left the office, he
4  learned five members who were coming to the office were questioned by FBI agents. These
5  members were specifically told that Life Savers was a scam. Agents demanded membership
6  agreements and other documents, which some of these members obviously intimidated turned
7  over.

8      29.    Raquel was placed in a chair with Arlette standing over her, while Wynar sat in
9  another chair directly facing Raquel. Wynar again informed Raquel, "We are doing an
10 investigation, do you understand?" Raquel replied, "No, I don't." Wynar then pulled the folded
11 "search warrant" from his jacket pocket and waived it in front of Raquel. She reached for it and
12 Wynar quickly put the paper back in his pocket.

13     30.    Arlette then commenced interrogating Raquel, "I want the money! Where is the
14 money?" Surprised, Raquel asked, "What money?" Arlette replied, "Life Savers' and Not Too
15 Big (to Fall)'s money, who has it?" Raquel answered, "I don't know." She asked again, "How
16 is the money spent? Who distributes the money?" Raquel again answered, "I don't know."
17 Arlette asked, "What do you do with the money you receive from memberships?" She asked,
18 "Who makes the decisions on how the money's distributed?" Raquel again stated, "I don't
19 know." Impatiently, Arlette yells, "Don't you get it?! I'm the IRS and I'm here for the
20 moneyyyy!!! I'm doing an investigation! I'm investigating fraud!" Raquel genuinely perplexed
21 responded, "No, I don't get it."

22     31.    Once again, she repeated herself, "I'm from the IRS! And I'm doing an
23 investigation! Fraud investigation! And I have to know who has the millions and millions of
24 dollars collected from the members. I want to know where's the money!!!" Upset, Arlette said,
25 "Somebody has millions and millions of dollars and I have to find them."

26     32.    Wynar noticed that Arlette had lost her patience and he took over the
27 interrogation. He said, "Look, you will be just fine if you tell us what we need to know."
28 "Look," he said, "you have to think about something. Larry, Jim and Nigel are not going to help

you get out of this one.  They are not with you.  Look at yourself, you are here working day and night while they are having a great life traveling all over."  Wynar then offered, "If you help us we will give you immunity and you will be out of this investigation."  Finally, he admonished Raquel, "Don't call Larry!"  By then, Arlette stood up and said, "I can't believe it.  All this for nothing, I can't believe it, I got nothing!"

33.    As the agents were preparing to leave, Wynar sat next to Raquel and informed her, "I'm here to protect the homeowners; I'm not working for the banks."  She just listened.  "I have to find out who has the millions and millions of dollars collected from members who think that they are getting a service that they are not really getting."  Raquel still said nothing.  Just minutes later, Brown called Raquel on her cell phone, which Rito was allowed to take when he was released.  Rito entered the room with the phone where Raquel was being held.  Brown, who was on the phone, asked to be put "on speaker," which incensed Wynar, who started screaming, "Is that Larry [Brown]?"  Wynar continues yelling, "That's Larry! That's not an attorney! That's Larry!  I told you not to call him! Why did you do it?! You were not supposed to call him!" Wynar sat back down in the seat next to Raquel and started stomping his feet, "You ruined everything! I'm doing this simultaneously at other places, and you were not supposed to tell them!"  Raquel responded that she had not called anyone.  Brown called, asking for Raquel, and Rito brought her the phone.

34.    Wynar held Raquel in the same room and prevented her from leaving.  Wynar was very upset, accusing Raquel of lying.   Wynar kept insisting that Raquel had lied to him, and kept asking, "Why did you do this to me?"  She was so frightened of what Wynar, who appeared incensed and disbalanced, might do, Raquel did not answer.

35.    Just before the agents left, Wynar handed Raquel back her keys, finally provided her with a copy of the search warrant, and a copy of the Receipt for Property, which listed all items the agents took.  When Raquel was finally allowed to leave the room where she was detained, she hurried to the front door and asked agent Wynar what she was supposed to do after the search.  She asked, "Do we close our doors? Do we keep them open?  What do we tell our members? Tell me?"  Wynar meekly responded, "I'm sorry, that's why we came early morning,

to do the least harm possible. Keep your doors open and continue your business as usual." The employees stood there dumbfounded.

### *Agent Wynar Continues His Campaign of Harassment*

36.     In November 2017, Wynar appeared at the beauty salon across the street from Life Saver member Margaret Marroquin's ("Marroquin") beauty salon. Wynar began showing the beauticians at Marroquin's neighboring salon copies of checks Marroquin had given Life Savers and telling them Wynar was looking for Marroquin because she was part of a scam involving homeowners and that the he wanted to talk to her. Marroquin's neighbors directed him to Marroquin's salon across the street.

37.     Wynar presented at Marroquin's salon with a copy of the check she had paid her Life Savers membership dues. He asked Marroquin, "Did you give this check to Larry or Raquel?" He inquired, "Did you hand Raquel this check?" She replied, "No." He asked again, "Did you put this check in Larry's hands?" She again replied, "No." Wynar continued, "Do you know how these monies were used?" Marroquin responded, "No. I do not know how these monies were used, I wrote the check to pay my Life Savers membership and that is it."

38.     Wynar insisted, "Did you know that Larry used this money to buy drugs, expensive cars, and jewelry for his girlfriend, trips, alcohol?" He kept repeating, "Larry used this money for drugs, alcohol and jewelry!" Wynar wanted to know if Marroquin wanted to sue [Larry] Brown. Marroquin inquired, "Have you sued Larry?" He answered, "No. We are looking for evidence against his scam before we can sue him."

39.     Wynar immediately stood up and said, "Here is my card with my cell phone number. If you want to sue Larry, let me know, or if you remember anything else or know something new, let me know," and then left.

40.     Some months later, on March 28, 2018, Wynar contacted another Life Savers member, Rosalinda Aceves ("Aceves"), by telephone. Unsuccessful, Wynar left Aceves a voicemail and she returned his call the same day. Wynar commenced the conversation by informing Aceves that she was identified as a victim of fraud. She skeptically replied that she

was not. Then, Wynar asked if Aceves knew Brown. She told him that she did. He then asked Aceves if she knew that Larry had "a bad fraudulent record." Afterwards, Wynar asked if Aceves gave Brown any money. When she said no, he accused her of lying. He instead she paid Brown $200,000. Despite Aceves' denials. Wynar insisted she had.

41. Aceves figured out that Wynar was referring to the money she had refinanced from her home, which she had used to help family in Mexico. Aceves asked if he had a warrant to access her information to which Wynar replied "I don't need no warrant –I'm the FBI." Wynar ended the call by disingenuously apologizing to Acceves, while insisting he was only investigating Brown. But then, Wynar ominously warned Aceves that if she was protecting Brown or otherwise involved in a fraud, he would report her to Immigration and Custom Enforcement ("ICE") agents.

42. On Sunday, April 8, 2018, agent Wynar reappeared at a Life Savers meeting in San Jose, California. Wynar stood outside the meeting hall and approached Life Saver members as they tried to enter the venue. He intermittently prevented members from entering the building, standing directly in front of their path, blocking access. Wynar felt compelled to tell members that Life Savers was a scam and that Brown had a long criminal record and was stealing from them. He told them that they needed to leave.

43. In one instance, Wynar spoke with Life Savers member Manny Mann ("Mann") and Mann's friend. Wynar told them that Brown had a long history of scams and an extensive criminal record. None of which is true.

44. In addition to the false statements Wynar made to the Life Savers members, he also threatened them by intimating that Mann and his friend would face criminal charges and harsh punishments unless they told him the truth about Brown's scam, in which case he would make sure that things went "lightly" for them. Wynar accused Mann and his friend as accomplices to Larry Brown.

45. Wynar continued his campaign of intimidating members for several hours as members came to attend the meeting throughout the afternoon. He repeated the same tactic of making false allegations about Life Savers and Brown, physically intimidating members from

entering the venue, and then threatening members that they would be arrested if they participated in the Life Savers scam.

## COUNT ONE

**Violations of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971); Fourth and Fifth Amendments**

**(Against Defendant Wynar and Does 1 through 100)**

46. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 45 of this Complaint with the same force and effect as if fully set forth herein.

47. FBI agents, specifically Wynar, and including the Doe Defendants, unreasonably detained and restrained Plaintiffs' employees without justification, without administering any *Miranda* rights, although Plaintiffs' employees were at all times compliant and never resisted or refused any agent's command. Employees asked to use the bathroom but were denied this basic right. Defendants' conduct (i.e. "Gestapo Tactics") in executing the search warrant and the unreasonable detention of the Plaintiffs created apprehension, fear and caused physical and emotional damages.

48. Defendant Wynar's and FBI agents' abusive conduct as described herein, including but not limited to handcuffing and arm twisting cooperative Plaintiffs (*see, e.g.*, paragraph 26 above), and detaining with the implication the objects of same detaining were not free to leave, without reason or cause, probable or otherwise, and yelling, threatening, intimidating and depriving bathroom visits, exceeded their authority and violated Plaintiffs' rights, privileges or immunities secured by the Constitution, including those under the Fifth Amendment, the Fourth Amendment, and the First Amendment. Defendant Wynar's and FBI agents' unreasonable and forceful arrest constituted excessive force *and* false imprisonment against Plaintiffs' employees in violation of their Fourth and Fifth Amendment rights. Defendants conduct is even more unreasonable based on their the knowledge from Cox's joint investigation of the Life Savers Monterey office on March 3, 2016 , the Bureau of Real Estate Order from August 8, 2016, which provided Life Savers could enter into agreements with

members to provide services to assist them in litigation challenging the validity and enforceability of promissory notes and deeds of trusts against the banks, and Cox's June 27, 2017 (approximately two weeks before) meeting with Raquel at the same Sunnyvale office.

49. The FBI agents' use of excessive force caused Plaintiffs' employees caused them severe physical injuries; pain and suffering; extreme emotional distress, fear, trauma, and humiliation.

50. Plaintiffs' claims against defendants Wynar and Does 1 through 100 are also based on their maintaining and permitting practices, policies and customs described above that would allow a rogue FBI agent to summarily transform a search warrant into an hours long detention and false arrest of individuals who were not the targets, suspects or persons of interest in any investigation, without the administration of any rights, during the execution of a search warrant for documents and computers.

51. As a result of their conduct, these defendants are liable for Plaintiffs' injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

52. Plaintiffs allege that the acts of these defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs employees' rights, welfare and safety, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

53. As a direct and legal result of these defendants' acts and omissions, Plaintiffs suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

## COUNT TWO

**Violations of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971); First Amendment**

**(Against Defendant Wynar)**

54. Plaintiffs repeat and realleges each and every allegation in paragraphs 1 through 53 of this Complaint with the same force and effect as if fully set forth herein.

55. On Sunday, April 8, 2018, agent Wynar reappeared at a Life Savers meeting in San Jose, California. Wynar stood outside the meeting hall and approached Life Saver members as they tried to enter the venue. He intermittently prevented members from entering the building, standing directly in front of their path, blocking access. Wynar felt compelled to tell members that Life Savers was a scam and that Brown was stealing from them. He told them that they needed to leave.

56. Wynar continued his campaign of intimidating members for several hours as members came to attend the meeting throughout the afternoon. He repeated the same tactic of making false allegations about Life Savers and Brown, physically intimidating and preventing members from entering the venue, and then threatening members that they would be arrested if they participated in the Life Savers scam. Wynar did this in direct violation of Life Savers' members' First Amendment rights to assemble.

57. As a result of Wynar's conduct, Plaintiffs' members were injured. Wynar is liable for Plaintiffs' injuries, either because he was an integral participant in the misconduct, or because he failed to intervene when he had the opportunity and duty to do so to prevent these violations.

58. Wynar's abusive conduct described herein (*see, e.g.* paragraph 26 above) exceeded Wynar's authority and deprived Plaintiffs of their rights, privileges and immunities under the First Amendment.

Plaintiffs allege that the acts of defendant Wynar were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs members' First Amendment and other important constitutional rights justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

59. As a direct and legal result of defendant's acts and omissions, Plaintiffs suffered damages, including, without limitation, pain and suffering, extreme mental and emotional

distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

## PRAYER FOR RELIEF

60. Plaintiffs request this Court find Defendant Wynar liable for monetary damages for an amount to be determined at trial, including punitive damages.

61. Plaintiffs request this Court grant other relief as considered just and proper, and/or which may deter future conduct on the part of Wynar or those similarly situated to Wynar, of a similar abusive nature, to these Plaintiffs or similarly situated individuals and entities.

DATE: November 16, 2018            LAW OFFICE OF CHARLES T. MARSHALL

                                   By:   /s/ Charles T. Marshall
                                         Charles T. Marshall
                                         Attorneys for Plaintiffs Life Savers
                                         Concepts Association of California
                                         and Life Savers Concepts Association, Inc.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all counts so entitled.

DATE: November 16, 2018            LAW OFFICE OF CHARLES T. MARSHALL

                                   By:   /s/ Charles T. Marshall
                                         Charles T. Marshall
                                         Attorneys for Plaintiffs Life Savers
                                         Concepts Association of California
                                         and Life Savers Concepts Association, Inc.