UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RAQUEL CHAVEZ; LUPITA CHAVEZ; RITO CHAVEZ; ESEQUIEL LOMBERA,<br><br>Plaintiffs,<br><br>v.<br><br>ROAHN WYNAR and DOES 1–100,<br><br>Defendants. | Case No. 18-CV-02252-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 73 |

Before the Court is Defendant Roahn Wynar's ("Wynar") motion to dismiss Plaintiffs' second amended complaint. ECF No. 73. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS in part and DENIES in part Wynar's motion to dismiss. *Id.*

# I.    BACKGROUND

## A.  Factual Background

### 1.  Life Savers Concepts Association, Inc., Background

In July 2012, Reverend Nigel Johnson founded an organization called Life Savers Concepts Association, Inc. ("Life Savers"). ECF No. 70 ("SAC") ¶ 1. The purpose of Life Savers was to assist low-income homeowners throughout Northern California combat foreclosures during

the financial crisis. *Id.* Life Savers' business model was to enter into membership agreements with homeowners, whereby members transferred claims related to the members' home loans to Life Savers. *Id.* ¶ 3. Life Savers then brought suit against the lenders who threatened to foreclose the members' properties. *Id.* ¶ 6. Most members also transferred five percent ownership interest in their homes to Life Savers. *Id.* ¶ 3. Between March 2013 and December 2015, Life Savers assigned all of its acquired rights to Larry Brown ("Brown"). *Id.* ¶¶ 4, 5. "Based on these assignments, Brown claims to hold a 5 percent ownership interest in each of the properties that secured the home loans of the members." *Id.* ¶ 5. The Office of the Monterey County District Attorney and the FBI have investigated Life Savers for fraud since at least 2014. *Id.* ¶¶ 7, 9. Plaintiffs in the instant case—Lupita Chavez ("Lupita"), Rito Chavez ("Rito"), Raquel Chavez ("Raquel"), and Esequiel Lombera ("Esequiel")[1]—are alleged to be employees of Life Savers. *Id.* ¶¶ 24, 41–42.

### 2. The FBI's Execution of a Search Warrant

On the morning of July 11, 2017, at around 9:20 a.m., Wynar and several other FBI agents executed a search warrant on Life Savers' Sunnyvale, California offices. *Id.* ¶¶ 23, 25. Wynar knocked on the door to the Life Savers offices. *Id.* ¶ 24. Three of the Plaintiffs, Lupita, Rito, and Raquel, "who all reside in the adjoining living quarters[,] were dressing or still in bed." *Id.* Eventually, Raquel answered the door. *Id.* Wynar and the FBI team entered the Life Savers offices and attempted to open various office doors, but the office doors were locked. *Id.* ¶ 25. Wynar asked why the office doors were locked and who else was present in the offices. *Id.* Raquel replied that the office doors were locked because Life Savers did not open until 11:00 a.m., and Raquel indicated that the three other Plaintiffs were also present in the offices. *Id.* Wynar asked Raquel why Raquel had been sleeping in the Life Savers offices, and Raquel explained that each of the Plaintiffs had resided in the offices for approximately three years. *Id.* ¶ 26. Wynar was

---

[1] The Court refers to the Plaintiffs by their first names because three of the Plaintiffs share a last name, and because Plaintiffs refer to themselves using their own first names throughout the SAC. *See, e.g.*, SAC ¶ 24.

initially surprised and alarmed when Raquel explained to Wynar that Plaintiffs lived in the offices. *Id.* Raquel also informed Wynar that one of the other Plaintiffs, Esequiel, "had special needs and was mentally deficient," and that Esequiel "was taking medication and under the care of a doctor." *Id.* ¶¶ 29, 30.

At some point during the conversation between Raquel and Wynar, 30 FBI agents entered the Life Savers offices with guns drawn. *Id.* ¶ 27. Wynar produced "a folded piece of paper from his pocket" and informed Raquel that the FBI was there "to execute a search warrant for documents and computers related to Life Savers." *Id.* Wynar told Raquel that Wynar would provide a copy of the search warrant to Raquel later. *Id.*

Eventually, Raquel called out for the other three Plaintiffs to emerge from their rooms. *Id.* ¶ 32. Lupita emerged from her room "not completely dressed and barefoot." *Id.* Lupita requested permission to return to her room to retrieve her blouse and shoes, and Lupita was initially instructed to wait. *Id.* "After some time," Lupita was permitted to return to her room and fully clothe herself in the presence of male FBI agent, who accompanied Lupita to the room. *Id.* ¶ 33.

Wynar and the FBI agents trained weapons on Plaintiffs. *Id.* ¶ 35. Wynar requested keys to the Life Savers offices from Raquel, and Raquel delivered Wynar a set of keys. *Id.* ¶ 34. Wynar then requested handcuffs from another agent, who allegedly told Wynar that handcuffs were not necessary but nonetheless complied with Wynar's request. *Id.* Wynar handcuffed Rito and Esequiel. *Id.* ¶¶ 36, 37. Rito alleges that Wynar grabbed him "with excessive force, twisting his hands and handcuffing him with his hands behind his back and ordered him to face the wall." *Id.* ¶ 37. Similarly, Esequiel alleges that Wynar grabbed him "with great force, pushed him against the wall with force, twisted his arm, searched and handcuffed him with his hands behind his back and ordered him to face the wall." *Id.* ¶ 36.

After Rito and Esequiel were handcuffed, approximately 20 more FBI agents entered the Life Savers offices. *Id.* Wynar pointed a gun at Rito and Esequiel after Rito and Esequiel were already handcuffed. *Id.* ¶ 92. This conduct caused Rito and Esequiel to feel "that they were going to be shot at any moment." *Id.* ¶ 40. The agents then began to perform a search of the Life Savers

offices. *Id.* ¶ 36. Rito and Esequiel allege that their handcuffs "were tight." *Id.* ¶ 38. Rito and Esequiel also allege that they "were cramping, thirsty, and needed to use the bathroom." *Id.* ¶ 39.

The FBI prevented any of the Plaintiffs from leaving, kept Rito and Esequiel handcuffed and facing the wall, and prevented the Plaintiffs from using their cell phones or office phones. *Id.* ¶ 42. At some point, Raquel asked whether she could use the bathroom, and Wynar instructed her to wait. *Id.* ¶ 46. Raquel repeated the request approximately fifteen minutes later, and a third time approximately an hour later. *Id.* Wynar permitted Raquel to use the bathroom upon the third request. *Id.* By that time, Rito and Esequiel had been handcuffed for over 30 minutes. *Id.*

Plaintiffs allege that the search concluded at around 10:00 a.m., approximately 20 minutes after the search began. *Id.* ¶¶ 43, 97. Rito and Esequiel remained handcuffed for some unspecified period after the search concluded, *id.* ¶ 47, but the two Plaintiffs' handcuffs were eventually removed, *id.* ¶ 48. Wynar then ordered the Plaintiffs to join Wynar and an IRS agent named "Arlette" at the front desk of the Life Savers offices. *Id.* Wynar instructed another FBI agent to take identification from Rito, Lupita, and Esequiel. *Id.* Wynar also informed Lupita that she still could not use her cell phone. *Id.* ¶ 49.

Rito and Esequiel were then questioned by Wynar and others. *Id.* ¶¶ 50–54, 93. Eventually, Lupita, Rito, and Esequiel "were instructed to leave." *Id.* ¶ 54. Rito was permitted to take Raquel's cell phone. *Id.* ¶ 63. However, Raquel herself "was prevented from leaving and told to sit down." *Id.* ¶ 54. Rito lingered nearby and eventually checked on the status of Raquel, at which point Wynar informed Rito that "there was nothing to be worried about." *Id.* ¶ 55. As Rito departed from the Life Savers offices, Rito learned that five Life Savers members "who were coming to the office" had been questioned by FBI agents and told that Life Savers was a scam. *Id.* ¶ 57.

Raquel was questioned by Wynar and Arlette concerning potential fraud involving Life Savers. *Id.* ¶¶ 58–61. Four other FBI agents accompanied Raquel, Wynar, and Arlette in the room, and these agents held weapons. *Id.* ¶ 65. As the questioning of Raquel concluded, Rito received a phone call from Brown on Raquel's cell phone. *Id.* ¶ 63. Rito entered the room in

4

which Raquel was located and attempted to provide Raquel with the cell phone. *Id.* Wynar became irate when Wynar learned that Brown had contacted Rito. *Id.* Wynar explained that the FBI "was doing this simultaneously at other places," and Rito had not wanted Brown to learn of the FBI's investigation. *Id.*

Before Wynar and other FBI agents departed, Wynar returned Raquel's keys to Raquel. *Id.* ¶ 66. Wynar also provided Raquel with copies of the search warrant and a "Receipt for Property," which listed the items that the agents had removed from the premises. *Id.* As a result of the search, Rito became depressed and "sought psychological treatment." *Id.* ¶¶ 68–69. Additionally, Esequiel "was hospitalized for several weeks" and suffered from PTSD following the search. *Id.* ¶¶ 70–72.

### B. Procedural History

On April 15, 2018, Plaintiffs filed an initial complaint. ECF No. 1. In addition to Wynar, Plaintiffs' complaint stated causes of action against Alicia Cox (an investigator for the Office of the Monterey County District Attorney) and the FBI. *Id.* Further, the complaint included Life Savers itself as a Plaintiff. *Id.* On August 27, 2018, the FBI filed a motion to dismiss the complaint. ECF No. 24. On October 12, 2018, Wynar also filed a motion to dismiss the complaint. ECF No. 36. The Court held a case management conference on October 17, 2018, and at the conference, Plaintiffs moved to dismiss Alicia Cox without prejudice. ECF No. 40. The Court granted Plaintiff's motion to dismiss Alicia Cox. ECF No. 41.

On October 17, 2018, the Court ordered Plaintiffs to either oppose the motions to dismiss filed by Wynar and the FBI or amend Plaintiffs' complaint by November 13, 2018. *Id.* On November 16, 2018, Wynar and the FBI filed a joint reply brief that noted that Plaintiffs had failed to either oppose the motions to dismiss or amend the complaint by the Court's November 13, 2018 deadline. ECF No. 42. Later in the same day, November 16, 2018, the parties filed a stipulation to extend the deadline for Plaintiffs to file an amended complaint to November 16, 2018. ECF No. 43. The Court granted the stipulation. ECF No. 45.

Thus, on November 16, 2018, Plaintiffs filed a first amended complaint ("FAC"). ECF

No. 44 ("FAC"). In the FAC, Plaintiffs no longer named the FBI as a defendant, which left Wynar and the unidentified Doe individuals as the only defendants. FAC ¶¶ 11–16.

On December 6, 2018, Wynar filed a motion to dismiss the FAC. ECF No. 47. On January 7, 2019, Plaintiffs filed an opposition. ECF No. 53. On February 12, 2019, Wynar filed a reply. ECF No. 59.

On May 16, 2019, the Court granted in part and denied in part the motion to dismiss the FAC. ECF No. 67. In the previous order, the Court dismissed all of Life Savers' claims with prejudice. *Id.* at 7–8, 12. The Court also dismissed with prejudice Plaintiffs' official capacity claims and Plaintiffs' Fourteenth Amendment claims. *Id.* at 7–8. The Court then analyzed Plaintiffs' *Bivens* claims for violations of the Fourth and Fifth Amendments. The Court dismissed without prejudice Plaintiffs' First Amendment and Fifth Amendment *Bivens* claims. *Id.* at 14–15. The Court also dismissed without prejudice the Fourth Amendment *Bivens* claims of Rito, Lupita, and Esequiel. *Id.* at 17. By contrast, the Court denied without prejudice the motion to dismiss Raquel's Fourth Amendment *Bivens* claim. *Id.*

In the wake of the Court's order, on June 17, 2019, Plaintiffs filed a second amended complaint ("SAC"). SAC. In the SAC, Plaintiffs allege Fourth Amendment and Fifth Amendment *Bivens* claims against Wynar. *Id.* ¶¶ 85–149. On July 15, 2019, Wynar filed the instant motion to dismiss the SAC. ECF No. 73 ("Mot."). On August 15, 2019, Plaintiffs opposed the motion, ECF No. 76 ("Opp."), and on August 29, 2019, Wynar replied, ECF No. 79 ("Reply").

The Court notes that, pursuant to the parties' stipulation to extend the briefing deadlines, Plaintiffs' opposition was due on August 14, 2019. ECF No. 75. However, Plaintiffs' opposition was not filed until August 15, 2019. ECF Nos. 76, 76-1. The opposition was therefore untimely. Nonetheless, the Court considers Plaintiffs' opposition for the purpose of resolving the instant motion to dismiss.

## II. LEGAL STANDARD

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a

short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  The U.S. Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995).  Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

## B. Leave to Amend

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation

marks omitted).  When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Id.* at 1130 (internal quotation marks omitted).  Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith.  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.  DISCUSSION

In the motion to dismiss the SAC, Wynar moves to dismiss (1) the Fourth Amendment *Bivens* claims of Lupita, Rito, and Esequiel; and (2) all of Plaintiffs' Fifth Amendment *Bivens* claims.  The Court first considers the Fourth Amendment *Bivens* claims of Lupita, Rito, and Esequiel.  The Court then turns to Plaintiffs' Fifth Amendment *Bivens* claims.

### A.  The Fourth Amendment *Bivens* Claims of Rito, Esequiel, and Lupita

Wynar argues that the Fourth Amendment *Bivens* claims of Rito, Esequiel, and Lupita are each barred by qualified immunity.[2]  When a defendant asserts qualified immunity in a motion to dismiss under Rule 12(b)(6), "dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies."  *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001).  "Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case."[3]  *Krainski v. Nevada ex rel. Bd. of*

---

[2] Wynar also briefly suggests, in a footnote, that "[i]t would be in the Court's discretion to reconsider its prior ruling with respect to Raquel if it finds that Wynar is entitled to qualified immunity for the other plaintiffs' claims."  Mot. at 16 n.5.  The Court declines to *sua sponte* reconsider the prior ruling with respect to Raquel.  ECF No. 67 at 17.

[3] Plaintiffs argue that "Wynar implicitly concedes that Plaintiffs Lupita Chavez, Rito Chavez, and Esequiel Lombera have pled the elements and facts to support a Fourth Amendment *Bivens* claim by seeking to have their claims dismissed under the doctrine of qualified immunity."  Opp. at 3.  As the qualified immunity standard alone demonstrates, this argument is incorrect.  Indeed, the first step of the qualified immunity analysis explicitly asks whether "the facts alleged show the

8

*Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010) (citation and internal quotation marks omitted). The Court may exercise its discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

The Ninth Circuit has held that if the SAC "'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (quoting *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992)).

Bearing this standard in mind, the Court analyzes the Fourth Amendment *Bivens* claims of Rito, Esequiel, and Lupita. Because the Fourth Amendment *Bivens* claims of Rito and Esequiel are materially similar, and because the parties brief them together, *e.g.*, Mot. at 21, the Court considers the Fourth Amendment *Bivens* claims of Rito and Esequiel together first, and then the Court considers Lupita's claim.

### 1. The Fourth Amendment *Bivens* Claims of Rito and Esequiel

The Fourth Amendment claims of Rito and Esequiel are based on several different theories. First, the SAC alleges that Wynar "handcuffed Plaintiffs Rito and Esequiel, [*sic*] in a manner which was excessive for securing the scene of investigation." SAC ¶ 91. Second, the SAC alleges that Wynar "continued to keep [a] gun[] pointed at Plaintiffs Rito and Esequiel even after they were handcuffed." *Id.* ¶ 92. Third, the SAC alleges that Wynar unreasonably detained and questioned Rito and Esequiel before Wynar permitted them to leave, notwithstanding the fact that the search of the Life Savers offices had concluded. *Id.* ¶¶ 50–53, 93.

In *Michigan v. Summers*, 452 U.S. 692 (1981), the United States Supreme Court held that a warrant to search a location "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705. "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention

officer's conduct violated a constitutional right." *Krainski*, 616 F.3d at 970.

or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005). Thus, in a *Summers*-type detention, an officer need not "have particular suspicion that an individual is involved in criminal activity or poses a specific danger." *Bailey v. United States*, 568 U.S. 186, 193 (2013). However, an officer still must "conduct[] the detention in a reasonable manner" in order for the detention to pass constitutional muster. *Dawson v. Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006).

In the instant case, the FBI searched the Life Savers offices pursuant to a search warrant, and Rito and Esequiel were detained in connection with this search. SAC ¶¶ 31–33, 43–45. Wynar therefore possessed "categorical" authority to detain Rito and Esequiel incident to the search. *Muehler*, 544 U.S. at 98. Further, "[i]nherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* at 99. Accordingly, the question before the Court is whether the SAC's allegations concerning Rito and Esequiel are clearly unreasonable in the context of a *Summers*-type detention. The Court considers each type of allegation in turn.

### a. Excessive Force Based on Allegations Related to the Use of Handcuffs

Rito and Esequiel allege that Wynar violated the Fourth Amendment because Wynar used handcuffs to restrain Rito and Esequiel. SAC ¶ 91. Wynar responds that these allegations fail to establish a violation of clearly established law related to *Summers*-type detentions. Mot. at 17. The Court agrees with Wynar. The SAC's allegations that Wynar handcuffed Rito and Esequiel does not constitute a violation of a clearly established right.

In *Muehler*, in the course of a *Summers*-type detention, the police roused a detainee from bed and, at gunpoint, placed the detainee in handcuffs for two to three hours. *Id.* at 96. The United States Supreme Court held that this treatment represented only a "marginal intrusion," which was outweighed by the government's countervailing interest in safety needed to execute the warrant. *Id.* at 99. Further, the United States Supreme Court noted that "the need to detain multiple occupants made the use of handcuffs all the more reasonable." *Id.* at 100. Accordingly, the United States Supreme Court upheld the detention as "plainly permissible" under the Fourth

Amendment. *Id.* at 98.

Plaintiffs attempt to distinguish *Muehler* because *Muehler* involved the execution of a search warrant for weapons, while the instant case "involved purported fraud, not a violent crime." Opp. at 7. However, other unique facts raise safety concerns in the instant case. For example, the SAC makes clear that Wynar and the FBI agents did not expect to find any residents of the Life Savers offices. SAC ¶ 26. Thus, Wynar was initially surprised and alarmed when Raquel explained to Wynar that all four of Plaintiffs lived in the offices. *Id.* Indeed, Wynar had apparently been entirely unaware of the existence of "residential quarters" in the Life Savers offices, and Wynar was similarly unaware that any individuals, much less four, resided in the Life Savers offices at the time of the search. *Id.* ¶¶ 26, 28. As in *Muehler*, Wynar was therefore ultimately forced to "detain multiple occupants," which raised additional danger for the officers. *Muehler*, 544 U.S. at 100. The SAC alleges that Wynar kept Rito and Esequiel in handcuffs for "over 30 minutes," SAC ¶ 46, which implies that the duration of the handcuffing in the instant case was far shorter than the two- to three-hour period that the United States Supreme Court approved in *Muehler*, 544 U.S. at 96. In light of *Muehler*, the Court cannot say that the mere decision to temporarily handcuff Rito and Esequiel violated clearly established law.

Plaintiffs claim that Wynar ultimately used "excessive force" to apply the handcuffs to Rito and Esequiel. SAC ¶ 37. This allegation is simply a legal conclusion cast as a factual allegation, which the Court need not accept as true on a motion to dismiss. *Fayer*, 649 F.3d at 1064. Plaintiffs also cursorily allege that the handcuffs on Rito and Esequiel "were tight." SAC ¶ 38. However, Plaintiffs do not allege that the handcuffs were improperly applied, that the handcuffs were *overly* tight, or that the handcuffing physically injured Rito and Esequiel. Nor do Plaintiffs allege that Rito and Esequiel ever complained to Wynar about the handcuffs in any way. Courts faced with analogous situations have held that plaintiffs failed to allege a Fourth Amendment violation, much less a clearly established one. *See, e.g.*, *Injeyan v. City of Laguna Beach*, 2013 WL 12212325, at *7 (C.D. Cal. Aug. 30, 2013) (finding no allegation of Fourth Amendment violation where there was no allegation that handcuffs were too tight or that plaintiff

United States District Court
Northern District of California

ever complained of pain caused by handcuffs).

Plaintiffs also claim that Rito and Esequiel were "cramping, thirsty, and needed to use the bathroom" during the "over 30 minute[]" period in which the two Plaintiffs were handcuffed. SAC ¶ 39. However, neither Rito nor Esequiel suggest that they informed Wynar of these facts, or that Wynar ever affirmatively denied the two Plaintiffs water or the use of the bathroom.[4] Rito and Esequiel themselves appear to have been handcuffed for less than an hour, *id.* ¶ 46, and the SAC alleges that Rito was in fact "allowed to use the bathroom" at some point after the handcuffs were removed, *id.* ¶ 54. Moreover, the SAC states that even when Rito and Esequiel were handcuffed, Wynar permitted another Plaintiff, Raquel, to use the bathroom. *Id.* ¶ 46. Courts analyzing similar allegations have determined that temporary denials of the ability to use a bathroom of similar durations are insufficient to state a Fourth Amendment violation, much less a clearly established one. *See Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000) ("We find no authority for the existence of a right on the part of one who is lawfully detained pursuant to the execution of a search warrant to use a toilet upon demand." (internal citation omitted)); *Pac. Marine Ctr., Inc. v. Silva*, 809 F. Supp. 2d 1266, 1286–87 (E.D. Cal. 2011) (although "[a] complete denial of the usage of the toilet over the period of many hours . . . might give rise to a constitutional violation," only "[o]ne request to use the restroom over a four hour period is not a constitutional violation").

In light of the foregoing case law, the SAC's allegations concerning Wynar's use of handcuffs on Rito and Esequiel fail to establish a Fourth Amendment *Bivens* claim based on a theory of excessive force that is sufficiently clearly established to overcome qualified immunity. Accordingly, the Court GRANTS Wynar's motion to dismiss the SAC to the extent that the SAC alleges a Fourth Amendment *Bivens* claim on the theory that handcuffing Rito and Esequiel during

---

[4] At several points, the SAC does allege that "Plaintiffs Raquel, Rito and Esequiel asked to use the bathroom but were denied this basic right." SAC ¶¶ 96, 133. While the SAC contains details concerning Raquel's requests to use the bathroom, *id.* ¶ 46, the SAC fails to provide any details about Rito's and Esequiel's requests to use the bathroom and fails to identify who denied their requests.

United States District Court
Northern District of California

the *Summers*-type detention amounted to excessive force. The Court previously dismissed with leave to amend the Fourth Amendment *Bivens* claim of Rito and Esequiel for failure to state a claim that Wynar's actions were unconstitutional under the Fourth Amendment. ECF No. 67 at 17. The Court warned that failure "to cure the deficiencies identified in this order or in Defendants' briefs will result in dismissal with prejudice of the claims dismissed in this order." *Id.* at 18. Plaintiffs failed to cure the deficiencies. Accordingly, the Court finds that granting leave to amend would be futile and unduly prejudicial to Wynar. *Leadsinger, Inc.*, 512 F.3d at 532. Thus, leave to amend is DENIED.

The Court therefore proceeds to analyze the SAC's allegations that Wynar pointed a gun at Rito and Esequiel after the two Plaintiffs were handcuffed.

### b. Excessive Force Based on Allegations Related to the Use of a Gun

The SAC makes several allegations concerning Wynar's use of a gun in the course of the detention. Specifically, the SAC alleges that "[a]fter Wynar and the FBI agents determined that they had custody over all four people staying on the premises and that they had the keys to the rooms in which were located the items which were the subject to [*sic*] the search warrant, they continued to train weapons on the four plaintiffs." SAC ¶ 35. The SAC further alleges that the "FBI agents, specifically Wynar, and including the Doe Defendants, continued to keep guns pointed at Plaintiffs Rito and Esequiel even after they were handcuffed." *Id.* ¶ 92. While these allegations are somewhat unclear, the Court construes them in the light most favorable to the Plaintiffs to mean that Wynar personally pointed a gun at Rito and Esequiel after they were handcuffed. The Court agrees with Plaintiffs that Wynar's use of a gun in this manner would violate clearly established law.

Wynar argues that Wynar is entitled to qualified immunity for these allegations on the basis of *Avina v. United States*, 681 F.3d 1127 (9th Cir. 2012).[5] In *Avina*, the Ninth Circuit

---

[5] Although *Avina* involved a claim by a detainee under the Federal Tort Claims Act, this claim required the Ninth Circuit to examine the reasonableness of the relevant officer's actions under *Muehler*. 681 F.3d at 1131–32.

13

addressed a situation in which the police executed a drug-related search warrant in a mobile home. *Id.* at 1129. When the police forcefully entered the home, an officer instructed one of the residents to drop to the floor. *Id.* When the resident refused to do so, an agent "forcefully pushed" the resident to the ground, pointed a gun in the resident's face, and instructed the resident not to move. *Id.* According to the Ninth Circuit, this use of force was reasonable under *Muehler* because the resident "was refusing to follow the agents' instructions" and because the search warrant was "inherently dangerous." *Id.* at 1132.

On the other hand, in *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc), the Ninth Circuit specifically held that "pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." *Id.* at 1015. In *Robinson*, the Ninth Circuit determined that two officers' decision to point guns at a plaintiff amounted to a Fourth Amendment violation because "[t]he crime under investigation was at most a misdemeanor, the suspect was apparently unarmed and approaching the officers in a peaceful way, there were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff." *Id.* The Ninth Circuit also noted that the plaintiff in *Robinson* "was aware of the immediate physical danger posed by a gun pointed at his head from point blank range; he testified that he feared for his life." *Id.* at 1010.

The allegations in the SAC far more closely resemble the facts in *Robinson* than *Avina*. Unlike the detainee in *Avina*, the SAC specifically alleges that Rito and Esequiel "were at all times compliant and never resisted or refused any agent's command" from the beginning of the *Summers*-type detention. SAC ¶ 87. As discussed *supra*, Wynar's execution of the search warrant may have initially presented a dangerous situation because Wynar and the FBI agents apparently did not expect to find any residents of the Life Savers offices. *Id.* ¶ 26. However, the SAC alleges that Wynar nonetheless pointed a gun at Rito and Esequiel "after they were handcuffed," under control, and fully cooperative. *Id.* ¶ 92. Further, as with the plaintiff in *Robinson*, the SAC specifically alleges that Rito and Esequiel feared for their lives and "felt that they were going to be

14

shot at any moment." *Id.* ¶ 40. In fact, Rito and Esequiel allege that the incident caused them serious lingering trauma. *Id.* ¶¶ 68–74.

Wynar points to *Hartmann*, 2010 WL 335677 (N.D. Cal. Jan. 22, 2010), which Wynar argues supports the proposition that "drawing [] weapons and even pointing them at Plaintiffs was objectively reasonable given the fact that agents were entering an unknown premises and found several people sleeping in what they thought was an office." Mot. at 19. However, *Hartmann* in fact *undermines* Wynar's position. In *Hartmann*, the officers performed a *Summers*-type detention and only had "their weapons drawn at the time plaintiff opened the door." *Hartmann*, 2010 WL 335677, at *1. The *Hartmann* court specifically noted that "if sworn facts had demonstrated that defendant [] had kept his weapon drawn and pointed at plaintiff after it was determined that plaintiff was unarmed, cooperative, and not a serious threat to officer safety," a Fourth Amendment violation would likely have been committed. *Id.* at *11 n.6. On a motion to dismiss, the Court must accept the SAC's factual allegations as true. *Manzarek*, 519 F.3d at 1031. The SAC alleges that Wynar continued to point his gun at Rito and Esequiel even though they were handcuffed and were "unarmed, cooperative, and not a serious threat to officer safety." *Hartmann*, 2010 WL 335677, at *11 n.6.

*Robinson* clearly established that pointing a gun at an "apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." 278 F.3d at 1016. Thus, construed in the light most favorable to the Plaintiffs, the SAC alleges that Wynar violated clearly established law because Wynar pointed a gun at Rito and Esequiel "after they were handcuffed," under control, and fully cooperative. The Ninth Circuit has held that if the SAC "'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Keates*, 883 F.3d at 1235 (quoting *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992)). However, it is also worth noting that "our decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity 'were the case permitted to proceed, at least to the

15

summary judgment stage' and the court is presented with facts providing context for the challenged actions." *Id.* (quoting *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004)).

Accordingly, the Court DENIES without prejudice Wynar's motion to dismiss the SAC to the extent that the SAC alleges a Fourth Amendment *Bivens* claim based on the theory that pointing a gun at Rito and Esequiel after they were handcuffed amounted to excessive force. It is premature at this juncture to decide whether qualified immunity applies because the factual record has not been developed. "Once an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). The Court proceeds to consider the remainder of the allegations related to the Fourth Amendment *Bivens* claims of Rito and Esequiel.

### c. Unreasonable Detention Based on Allegations Related to Prolonged Questioning

Finally, Plaintiffs allege that Rito and Esequiel were unreasonably detained and questioned by Wynar after the search that gave rise to the *Summers*-type detention had ended, in violation of the Fourth Amendment. SAC ¶¶ 47–54, 93. Wynar responds that the SAC's allegations are insufficient to overcome qualified immunity on this theory because other courts have "cast doubt" on the underlying Ninth Circuit case law relied on by Plaintiffs. Mot. at 16. Wynar also argues that the allegations of Rito and Esequiel are too "vague" to constitute "specific allegations that their handcuffing or detention lasted substantially longer than the search of Life Savers' offices." *Id.* at 17. The Court agrees with Plaintiffs. The alleged coerced questioning of Rito and Esequiel after the search of the Life Savers offices had already concluded violates clearly established law in the Ninth Circuit.

In *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003), the Ninth Circuit examined the detention of several employees in a waiting room at a workplace while the workplace was searched. According to the *Ganwich* court, the initial detention of the employees constituted a valid *Summers*-type detention. *Id.* at 1120. However, the officers in *Ganwich* also informed the

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

plaintiffs that "they would not be released until they submitted to individual interrogations." *Id.* at

1121. Further, the officers in *Ganwich* held the employees "incommunicado" by barring the use

of phones during the detention. *Id.* at 1124. The *Ganwich* court explained that "the officers'

holding the plaintiffs incommunicado and using their continued detention to coerce them into

submitting to interrogations" was clearly unconstitutional. *Id.*

Rito and Esequiel allege that both Plaintiffs "remained handcuffed after the search for

documents had been completed." SAC ¶ 47. At some later point, Wynar removed the two

Plaintiffs' handcuffs, but the SAC indicates that Rito and Esequiel were still "not allowed to

leave." *Id.* ¶ 48. Moreover, while still under detention, Rito and Esequiel heard Wynar inform

Lupita, "You are not allowed to use your cell phone." *Id.* ¶ 49. Rito and Esequiel were then

questioned before they were finally "instructed to leave."[6] *Id.* ¶¶ 50–54. Construing these

allegations in the light most favorable to Plaintiffs, the SAC alleges that Rito and Esequiel were

denied the use of cell phones and detained until they answered the officers' questions, and that this

questioning occurred after the search that gave rise to the *Summers*-type detention had already

concluded. This Court already determined that similar facts were sufficient to allege a violation of

clearly established law at the motion to dismiss stage with respect to Raquel. ECF No. 67 at 17.

In response, Wynar argues that the vitality of *Ganwich* has become unclear in the wake of

the United States Supreme Court's decision in *Muehler*, 544 U.S. at 96. The Court disagrees. The

Ninth Circuit reaffirmed the holding of *Ganwich* in *Dawson v. City of Seattle*, 435 F.3d 1054 (9th

Cir. 2006), and continues to treat *Ganwich* as good law. *See, e.g.*, *Perez Cruz v. Barr*, 916 F.3d

1128, 1141 (9th Cir. 2019) (describing the holding of *Ganwich* and treating it as valid). Wynar

further claims that *Muehler* "appears to have restricted *Ganwich*'s holding" to require a showing

that questioning during a *Summers*-type detention "prolonged the detention." Mot. at 16. Even if

---

[6] The involvement of Wynar in the questioning of Esequiel is also somewhat unclear. *See* SAC ¶
50 ("Esequiel was questioned by an FBI agent before he was allowed to leave."). For the purposes
of the instant motion, the Court construes the SAC to allege that Wynar either personally
questioned, or ordered the questioning of, Esequiel as well as Rito. *See id.* ¶ 93 ("FBI agents,
specifically Wynar, and including the Doe Defendants, questioned Rito and Esequiel at
gunpoint.").

United States District Court
Northern District of California

this were true, however, Rito and Esequiel do in fact allege in the SAC that the questioning prolonged their detention. Indeed, as discussed, Rito and Esequiel allege that the questioning occurred after the search had already been completed. SAC ¶¶ 43, 50–53; *see Muehler*, 544 U.S. at 101 (upholding questioning during *Summers*-type detention because "the Court of Appeals did not hold that the detention was prolonged by the questioning").

The sole case that Wynar cites for the proposition that other courts have "cast doubt" on *Ganwich* is an out-of-circuit district court decision, *Mountain Pure, LLC v. Roberts*, 93 F. Supp. 3d 993 (E.D. Ark. 2015). When determining whether a law is "clearly established" for the purposes of qualified immunity, however, "[i]f the right is clearly established by decisional authority of the Supreme Court or of this Circuit, our inquiry should come to an end." *Hopkins v. Bonvicino*, 573 F.3d 752, 772 (9th Cir. 2009) (alteration in original) (internal quotation marks omitted). "Only in the absence of binding precedent do we consider other sources of decisional law such as out-of-circuit cases." *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015). *Ganwich* constitutes valid, binding authority on this Court. Thus, *Mountain Pure, LLC* is irrelevant to the availability of qualified immunity in the instant case.

Wynar also argues that the SAC is too vague to allege a clear violation of *Ganwich*. Mot. at 17. The Court agrees that the SAC is not a model of clarity, particularly with respect to the chronology of the alleged events.[7] Notwithstanding this fact, the Court must construe the SAC in the light most favorable to the Plaintiffs. *Manzarek*, 519 F.3d at 1031. From this perspective, and as discussed *supra*, the SAC does at least allege that Wynar either personally questioned, or ordered the questioning of, Rito and Esequiel after the search of the Life Savers offices had concluded, and as a condition of their release from the *Summers*-type detention. SAC ¶¶ 47–54,

---

[7] At one point, for instance, the SAC claims that "[a]lthough the search for documents described in the search warrant was completed by approximately 10:00 a.m., FBI agents, specifically Wynar, and including the Doe Defendants, remained on site for approximately four hours during which time they detained all four plaintiffs and questioned them." SAC ¶ 97; *see also* SAC ¶ 134 (same). However, Plaintiffs concede in their opposition that this language "does not say that all Plaintiffs were detained for four hours - only Raquel was detained that long - but that during the four hours the four plaintiffs were detained and questions. [*sic*]" Opp. at 5.

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

93. This is sufficient to allege a violation of clearly established law under *Ganwich*. Thus, construed in the light most favorable to the Plaintiffs, the SAC alleges that Wynar violated clearly established law because Wynar either personally questioned, or ordered the questioning of, Rito and Esequiel before the two Plaintiffs were permitted to leave, and that this questioning prolonged the detention of Rito and Esequiel.

The Ninth Circuit has held that if the SAC "'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Keates*, 883 F.3d at 1235 (quoting *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992)). However, it is also worth noting that "our decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity 'were the case permitted to proceed, at least to the summary judgment stage' and the court is presented with facts providing context for the challenged actions." *Id.* (quoting *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004)).

Accordingly, the Court DENIES without prejudice Wynar's motion to dismiss the SAC to the extent that the SAC alleges a Fourth Amendment *Bivens* claim based on the theory that the prolonged questioning of Rito and Esequiel constituted unreasonable detention. It is premature at this juncture to decide whether qualified immunity applies because the factual record has not been developed. "Once an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). The Court proceeds to consider the Fourth Amendment *Bivens* claim of Lupita.

### 2. The Fourth Amendment *Bivens* Claim of Lupita

As with Rito and Esequiel, the Fourth Amendment *Bivens* claim of Lupita is based on several different theories. First, Lupita alleges that her *Summers*-type detention was unreasonable because it occurred while Lupita was "not completely dressed and barefoot." SAC ¶ 32. Second, Lupita alleges that Wynar unreasonably denied Lupita the use of a cell phone after the search of

United States District Court
Northern District of California

the Life Savers offices had been completed.[8]  *Id.* ¶ 49.

Like the Fourth Amendment *Bivens* claims of Rito and Esequiel, the question before the Court is whether the SAC's allegations concerning Lupita are clearly unconstitutional in the context of a *Summers*-type detention.  The Court considers each type of allegation in turn.

### a. Unreasonable Detention Based on Allegations Related to Shoes and Clothing

The SAC alleges that Lupita was in the shower when the FBI agents arrived, and that Lupita eventually emerged from her room "not completely dressed and barefoot."  SAC ¶ 32.  The SAC alleges that when Lupita requested permission to return to her room to get dressed, Lupita was initially "told to wait" by an unidentified actor.  *Id.*  The SAC also alleges that "[a]fter some time, Lupita was allowed to return to her room, accompanied by a male FBI agent who watched her get fully dressed."  *Id.* ¶ 33.  Wynar argues that these facts are insufficient to allege a violation of clearly established law.  Mot. at 19–21.  The Court agrees.

In *Dawson*, 435 F.3d 1054 (9th Cir. 2006), the Ninth Circuit explained that an officer's decision not to permit a detainee to retrieve shoes was reasonable in the course of a *Summers*-type detention, notwithstanding the presence of glass on the floor of the area in which the detention occurred.  *Id.* at 1069.  The *Dawson* court explained that allowing the detainee to retrieve shoes might have frustrated the ongoing search "to the extent that other tenants might have similarly requested access to their rooms to retrieve items that they wanted."  *Id.* at 1070.  Further, courts have held that a *Summers*-type detention may still be conducted reasonably when a detainee is held "barefoot and in his underwear" for approximately thirty minutes.  *United States v. Washington*, 2019 WL 1440261, at *2, *4 (D. Or. Apr. 1, 2019).

Lupita's allegations fail to establish the violation of any clearly established Fourth Amendment right.  Lupita alleges only that she was "not completely dressed and barefoot" when

---

[8] The SAC occasionally suggests that Wynar pointed a gun at Lupita at the outset of the search. SAC ¶ 35.  However, unlike Rito and Esequiel, Lupita was never handcuffed, and the SAC does not specifically allege that Wynar continued to point a gun at Lupita later in the search, once the officers had established control over the offices.  SAC ¶ 92.

she was first detained.  The extent to which Lupita was "not completely dressed" is entirely unclear from the SAC.  However, even if Lupita were detained in her underwear, *Washington*, 2019 WL 1440261, concluded that a detainee may be held for approximately thirty minutes pursuant to a *Summers*-type detention without running afoul of the Fourth Amendment.  In the instant case, the SAC indicates that Lupita was permitted to return to her room to fully clothe herself at some point during the approximately twenty-minute search.  SAC ¶ 43.  Hence, Lupita was detained for less time than the detainee in *Washington*, 2019 WL 1440261.  Additionally, as in *Dawson*, the detention in the instant case involved multiple Plaintiffs, who may have each "similarly requested access to their rooms to retrieve items that they wanted" and thereby frustrated the ongoing search if Lupita were permitted to return to her room on command.  435 F.3d at 1070.

In light of the foregoing case law, the SAC's allegations concerning Lupita's temporary lack of access to shoes and clothing fails to establish a Fourth Amendment *Bivens* claim based on a theory of unreasonable detention that is sufficiently clearly established to overcome qualified immunity.  Accordingly, the Court GRANTS Wynar's motion to dismiss the SAC to the extent that the SAC alleges a Fourth Amendment *Bivens* claim on the theory that temporarily denying Lupita access to her shoes and clothing during the *Summers*-type detention amounted to unreasonable detention.  The Court previously dismissed with leave to amend Lupita's Fourth Amendment *Bivens* claim for failure to state a claim that Wynar's actions were unconstitutional under the Fourth Amendment.  ECF No. 67 at 17.  The Court warned that failure "to cure the deficiencies identified in this order or in Defendants' briefs will result in dismissal with prejudice of the claims dismissed in this order." *Id.* at 18.  Plaintiffs failed to cure the deficiencies. Accordingly, the Court finds that granting leave to amend would be futile and unduly prejudicial to Wynar.  *Leadsinger, Inc.*, 512 F.3d at 532.  Thus, leave to amend is DENIED.  The Court proceeds to analyze the SAC's allegations that Lupita was denied access to her cell phone during the detention.

**b.  Unreasonable Detention Based on Allegations Related to Cell Phone Access**

The SAC alleges that Wynar deprived Lupita of the use of a cell phone even after the search of the Life Savers offices had concluded. SAC ¶ 49. Wynar argues that this decision was permissible under *Ganwich*, 319 F.3d 1115. Mot. at 21. The Court disagrees with Wynar and concludes that the SAC's allegations involving Lupita's cell phone may amount to unreasonable detention under clearly established law.

In *Ganwich*, the Ninth Circuit held that during a *Summers*-type detention, "preventing the plaintiffs from making a telephone call for extended times during the detention" may violate the Fourth Amendment. 319 F.3d at 1123. The *Ganwich* court explained that "officers may prevent temporary detainees from using a telephone only so long as that restriction is 'carefully tailored to its underlying justification.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). If an officer unjustifiably deprives a detainee of telephone access during a *Summers*-type detention, the officer violates the Fourth Amendment. *Id.*

In the instant case, the SAC alleges that Wynar refused to allow Lupita to use her cell phone after the search of the Life Savers offices had already concluded. SAC ¶ 49. Wynar argues that this denial was "carefully tailored to its underlying justification," as required by *Ganwich*. Mot. at 21. In particular, according to Wynar, Wynar sought to prevent Lupita "from contacting Larry Brown and other Life Savers personnel who could interfere with contemporaneous searches that the FBI was conducting." *Id.*

The *Ganwich* court specifically discussed this justification. According to the *Ganwich* court, "preventing the plaintiffs from warning" the other subjects of an investigation "is a legitimate interest but a short-lived one." 319 F.3d at 1123. The *Ganwich* court therefore held that the availability of the justification depends on timing. If officers seek to search other locations at the same time as the *Summers*-type detention, "then the need to restrict the plaintiffs' communications to prevent the destruction of evidence disappear[s] once the searches of the other sites [are] underway." *Id.* On the other hand, if officers seek to search other locations *after* the *Summers*-type detention, then restricting the telephone usage is "almost pointless," since plaintiffs could "warn conspirators at the other offices of the investigation once they [are] released." *Id.* In

22

any event, the officers' justification must be weighed against "plaintiffs' stronger interests in contacting relatives." *Id.*

According to the SAC, Wynar indicated that the FBI was in the process of performing investigations "simultaneously at other places." SAC ¶ 63. The timing of these investigations is unclear from the SAC, but Wynar's statement may be read to suggest that searches of other sites already "were underway" when Wynar deprived Lupita of the use of her cell phone. In that event, Wynar's justification for depriving Lupita of her cell phone would have already "disappeared" under *Ganwich*. 319 F.3d at 1123.

Wynar argues that *Ganwich* is inapposite because "Lupita has not alleged that she was prevented from using her telephone for four hours or denied the ability to contact relatives to arrange childcare." Mot. at 21. However, *Ganwich* does not require allegations of this nature. The *Ganwich* court did not impose a bright line rule for the length of time in which a detainee could be restricted from using a phone. Instead, the *Ganwich* court held that such a restriction could last "only so long as that restriction is 'carefully tailored to its underlying justification.'" 319 F.3d at 1123 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). In the instant case, it is unclear from the face of the SAC how much time had already passed when Wynar informed Lupita that she could not use her cell phone, but construing the SAC in the light most favorable to Plaintiffs, Wynar imposed the restriction "over one hour" from the time of the officers' initial arrival and the start of the *Summers*-type detention. SAC ¶ 46.

Nor did the *Ganwich* court require a specific allegation that a detainee was "denied the ability to contact relatives to arrange childcare." Mot. at 21. The *Ganwich* court offered myriad reasons why detainees "may have needed to use the telephone" without suggesting that affirmative proof of any particular reason was required to state a violation of the Fourth Amendment. 319 F.3d at 1123. Thus, construed in the light most favorable to Plaintiffs, the SAC alleges that Wynar violated clearly established law because Wynar denied Lupita the use of her cell phone after the search concluded and that this restriction was not "carefully tailored to its underlying justification." *Ganwich*, 319 F.3d at 1123 (internal quotation marks and citation omitted).

The Ninth Circuit has held that if the SAC "'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Keates*, 883 F.3d at 1235 (quoting *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992)). However, it is also worth noting that "our decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity 'were the case permitted to proceed, at least to the summary judgment stage' and the court is presented with facts providing context for the challenged actions." *Id.* (quoting *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004)).

Accordingly, the Court DENIES without prejudice Wynar's motion to dismiss the SAC to the extent that the SAC alleges a Fourth Amendment *Bivens* claim based on the theory that the denial of cell phone access to Lupita constituted unreasonable detention. It is premature at this juncture to decide whether qualified immunity applies because the factual record has not been developed. "Once an evidentiary record has been developed through discovery, defendants will be free to move for summary judgment based on qualified immunity." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). The Court proceeds to consider the Fifth Amendment *Bivens* claims of all Plaintiffs.

### B. Plaintiffs' Fifth Amendment *Bivens* Claims

Wynar argues that the four Plaintiffs' Fifth Amendment *Bivens* claims fail for two reasons. First, Wynar asserts that Plaintiffs' Fifth Amendment *Bivens* claims present a new *Bivens* context and that special factors counsel against implying a remedy in this new context. Mot. at 10–11. Second, Wynar argues that qualified immunity protects Wynar from Plaintiffs' Fifth Amendment *Bivens* claims because the SAC fails to allege the violation of any clearly established constitutional right. *Id.* at 14.

Plaintiffs make no response to either of these arguments. *See generally* Opp. Instead, Plaintiffs devote their opposition exclusively to defending the Fourth Amendment *Bivens* claims. *Id.* at 3–8. The Court construes Plaintiffs' lack of response as an abandonment of Plaintiffs' Fifth

24

Amendment *Bivens* claims. *See Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1014 (N.D. Cal. 2018) ("Plaintiff has abandoned this theory by failing to respond to Defendants' arguments regarding it in his opposition to the motion to dismiss."); *see also Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (holding that plaintiff "abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment").

Thus, the Court GRANTS Wynar's motion to dismiss Plaintiffs' Fifth Amendment *Bivens* claims with prejudice on the basis of this abandonment. *See Lee v. Retail Store Employee Bldg. Corp.*, 2017 WL 346021, at *20 (N.D. Cal. Jan. 24, 2017) (denying leave to amend because plaintiffs' "failure to even argue the issue in their opposition indicates a waiver of this claim"); *Homsy v. Bank of Am., N.A.*, 2013 WL 2422781, at *5 (N.D. Cal. June 3, 2013) ("In instances where a plaintiff simply fails to address a particular claim in its opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice.").

Moreover, the Court also dismisses Plaintiffs' Fifth Amendment *Bivens* claims because Plaintiffs have never cited any authority to support the proposition that the Fifth Amendment's right against self-incrimination or that a *Miranda* violation may give rise to a *Bivens* claim, which is the theory that the SAC appears to allege. SAC ¶ 111. In fact, the United States Supreme Court has repeatedly held that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). Additionally, as the Court previously noted, the SAC's allegations in support of this *Bivens* theory are "scant" and "conclusory." ECF No. 67 at 15 (internal quotation marks omitted). Thus, the Court concludes that amendment of Plaintiffs' Fifth Amendment *Bivens* claims would be futile for this reason as well. *See Leadsinger*, 512 F.3d at 532 (noting that dismissal with prejudice is appropriate where amendment would be futile).

## IV.    CONCLUSION

For the foregoing reasons, the Court rules as follows on Wynar's motion to dismiss the SAC:

- The motion to dismiss Plaintiffs' Fifth Amendment *Bivens* claims is GRANTED with

25

prejudice;

- To the extent that the Fourth Amendment *Bivens* claims of Rito and Esequiel are based on the theory that handcuffing Rito and Esequiel during the *Summers*-type detention amounted to excessive force, the motion to dismiss is GRANTED with prejudice;

- To the extent that the Fourth Amendment *Bivens* claims of Rito and Esequiel are based on the theory that pointing a gun Rito and Esequiel during the *Summers*-type detention amounted to excessive force, the motion to dismiss is DENIED without prejudice;

- To the extent that the Fourth Amendment *Bivens* claims of Rito and Esequiel are based on the theory that the prolonged questioning of Rito and Esequiel constituted unreasonable detention, the motion to dismiss is DENIED without prejudice;

- To the extent that the Fourth Amendment *Bivens* claim of Lupita is based on the theory that temporarily denying Lupita access to her shoes and clothing during the *Summers*-type detention amounted to unreasonable detention, the motion to dismiss is GRANTED with prejudice; and

- To the extent that the Fourth Amendment *Bivens* claim of Lupita is based on the theory that temporarily denying Lupita access to her cell phone during the *Summers*-type detention amounted to unreasonable detention, the motion to dismiss is DENIED without prejudice.

**IT IS SO ORDERED.**

Dated:  November 8, 2019

_____

LUCY H. KOH
United States District Judge