1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10                SAN JOSE DIVISION

11

12    RAQUEL CHAVEZ; LUPITA CHAVEZ;          Case No. 18-CV-02252-LHK
      RITO CHAVEZ; and ESEQUIEL
13    LOMBERA,                                **ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANT'S
14                Plaintiffs,                 MOTION FOR SUMMARY
                                              JUDGMENT**
15          v.

16    ROAHN WYNAR,

17                Defendant.

18

19          Plaintiffs Raquel Chavez, Lupita Chavez, Rito Chavez, and Esequiel Lombera

20    ("Plaintiffs")[1] brought suit against Defendant Roahn Wynar ("Wynar" or "Defendant") alleging

21    violations of their constitutional rights during the execution of a search warrant.  Before the Court

22    is Wynar's motion for summary judgment.  ECF No. 110 ("Mot.").  Having considered the

23    parties' briefing, the relevant law, and the record in this case, the Court GRANTS in part and

24    DENIES in part Wynar's motion for summary judgment.

25    _____

26    [1] The Court refers to the Plaintiffs by their first names because three of the Plaintiffs share a last
      name, and because Plaintiffs refer to themselves using their own first names throughout the second
27    amended complaint.  *See, e.g.*, Second Amended Complaint, ECF No. 84, at ¶ 24.
                                              1
28

# I. BACKGROUND

## A. Factual Background

### 1. Life Savers Concepts Association, Inc. and FBI Investigation

This case arises from an investigation into Life Savers Concepts Association, Inc. ("Life Savers"), an organization founded to assist low-income homeowners throughout Northern California and to combat foreclosures during the financial crisis. ECF No. 84, at 2. Life Savers' business model was to enter into membership agreements with homeowners, whereby members transferred claims related to the members' home loans to Life Savers.

Beginning in 2014, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service Criminal Response Division ("IRS"), and the Monterey County District Attorney's Office ("DA's Office") began investigating Life Savers and Larry Brown, an individual associated with Life Savers, for financial fraud. ECF No. 110-2 ("Lee Decl."), at ¶¶ 2, 8; ECF No. 110-1 ("Kay Decl."), at ¶¶ 2, 32 and Ex. 2; and ECF No. 110-9 ("Wynar Depo."), at 190:17–20 and 291:10–17.

In July of 2017, the FBI obtained a search warrant from the Northern District of California to search the Sunnyvale, CA office of Life Savers and a related entity, "Not Too Big to Fall Association" (collectively, "Life Savers office"). Lee Decl. at ¶ 3 and Ex. 1.

### 2. The FBI Executes a Search Warrant on July 11, 2017

On the morning of July 11, 2017, at approximately 9:00 to 9:30 a.m., Wynar and approximately twenty-five participants from the FBI, IRS, and the DA's Office executed a search warrant at the Sunnyvale Life Savers office. Wynar Depo. at 243:5–9; 308:1–5; ECF No. 110-3 ("Taylor Decl."), at ¶ 6; ECF No. 110-6 ("Raquel Depo."), at 43:14; and ECF No. 110-7 ("Rito Depo."), at 37:10–11. Wynar was wearing a suit and tie and had his hair in a ponytail. Raquel Depo. at 42:7–20. Wynar knocked on the front door of the Life Savers office and the FBI agents announced that they were the police. ECF No. 110-8 ("Esequiel Depo."), at 39:9–13.

There were four occupants in the Life Savers office on the morning of July 11, 2017. Raquel and Rito Chavez, who are married, had slept in the living quarters of the office. Raquel Depo. at 34:18–35:4. Raquel was the office manager of the Life Savers Sunnyvale office and Rito

United States District Court
Northern District of California

volunteered for Life Savers. *Id.* at 22:12–13; Rito Depo. at 21:11–18. Lupita Chavez also slept in the Life Savers office that night and volunteered for Life Savers. ECF No. 110-5 ("Lupita Depo."), at 149:16–18; 24:4–15. A fourth occupant, "America," had also slept in the office that night, but departed early in the morning. Raquel Depo. at 35:12–22. Finally, Esequiel Lombera, another Life Savers volunteer, arrived at the Life Savers office between 7:00 a.m. and 7:30 a.m. Esequiel Depo. at 35:21–36:2.

Wynar knocked on the front door for approximately one to two minutes. *Id.* at 39:14–17. While Wynar knocked on the door, Esequiel went to Raquel and Rito's room to tell them that the police were at the door. Raquel got out of bed and opened the front door. *Id.* at 40:22–25; 44:2–6; Raquel Depo. at 37:2–6. When Raquel opened the door, the agents told Raquel that they had a search warrant and asked if anyone else was in the office. *Id.* at 40:11–14. Raquel stated that there were three other people in the office. *Id.* at 109:23–110:18.

Wynar and fellow FBI agents Robert Kay and Bryan Taylor entered the office. Kay Decl. ¶ 7; Taylor Decl. ¶ 9. When the agents entered the office, they saw other occupants moving around in the back of the office. Wynar "realized we probably would have to clear the whole place to find out what was actually happening." Wynar Depo. at 43:5–8. Taylor thought that the FBI agents were outnumbered and drew his sidearm. Taylor Decl. at ¶ 9. Kay and other agents also drew their sidearms. Kay Decl. ¶ 8. Taylor called out to the warrant execution team to help clear the premises. Wynar Depo. at 46:22–47:4.

The FBI agents detained the four occupants of the Life Savers office. Taylor Decl. ¶¶ 13–18. Taylor found Esequiel and instructed him to take off his backpack. Esequiel Depo. at 49:1–6. Esequiel testified that a "Mexican" FBI agent was "pointing a gun at me as I walked out." *Id.* at 49:8, 2–3. The FBI agent then "frisked [Esequiel], and then put handcuffs on [him]." *Id.* at 49:5–6. Rito testified that Wynar handcuffed him and placed him against the wall next to Esequiel. Rito Depo. at 41:24–42:4, 42:20–21, 44:7–22. Rito testified that the "entire group" of agents was "pointing at me with their rifle." *Id.* at 45:1–2. Neither Lupita nor Raquel was handcuffed.

United States District Court
Northern District of California

Lupita Depo. at 76:4; Raquel Depo. at 43:8–9. Lupita did testify that when she arrived in the room where Rito and Esequiel were handcuffed and facing the wall, "many rifles" were drawn. Lupita Depo at 102:20–22. Raquel also testified that "[a]ll the officers" were "pointing the guns to us, at us." Raquel Depo. at 41:17–23. None of the Plaintiffs testified that Wynar pointed a firearm at them or ordered any agent to point a weapon at any plaintiff. *See, e.g.*, Raquel Depo. at 42:24–25, 43:4; Lupita Depo at 137:1–7; and Rito Depo. at 44:24–45:2.

### 3. The Agents Proceed with their Search and Release Rito, Esequiel, and Lupita

The FBI agents then brought Rito, Esequiel, Raquel, and Lupita from the main office to the reception/lobby area. Esequiel Depo. at 55:14–23 and 57:4–12; Rito Depo. at 50:4–24; Raquel Depo. at 57:11–18. Wynar instructed Plaintiffs that they "cannot use any phones," and then "ordered Lupita, Esequiel, and Rito to show their IDs." Raquel Depo. at 57:11–58:1. Lupita got out her cell phone because the phone case held her ID card. *Id.* at 58:2–6. Wynar immediately said "I told you guys no phones." *Id*. at 58:2–4. To which Lupita responded, "I'm not using my phone. I'm pulling out my ID." *Id*. at 58:8–9.

At some point after this, Wynar had the handcuffs taken off Rito and Esequiel. *Id.* at 59:2–3. Wynar then requested Rito and Esequiel's IDs and "wrote down all the information." *Id*. at 59:1–5. Wynar then told Lupita, Rito, and Esequiel that they were free to go. *Id.* at 59:8–10; Esequiel Depo. at 64:4–11. Lupita, Rito, and Esequiel then walked out to the Life Savers parking lot. Lupita Depo. at 156:15–18. In the parking lot, Lupita, Rito, and Esequiel encountered America, the fourth resident of the Life Savers office. America drove Esequiel to a 11:00 a.m. doctor's appointment. Esequiel Depo. at 68:4–10. Rito waited outside the Life Savers office for Raquel. Rito Depo. at 67:8–10.

### 4. Wynar Questions Raquel

Wynar then questioned Raquel. Wynar testified that he told Raquel that "the interview was totally voluntary," and then asked "if she would be willing to interview with us. And she affirmatively said she was willing." Wynar Depo. at 202:17–21; Kay Decl. ¶ 25. However, each

4

of the four Plaintiffs testified that Raquel was instructed not to leave. Esequel testified that he "asked if Raquel could go and they said, 'No. She needs to stay.'" Esequel Depo. at 64:15–16; *see also* Lupita Depo. at 154:18–19; Rito Depo. at 56:24–25. Raquel testified that after Wynar told Rito, Lupita, and Esequiel that they could leave, Wynar "looked at me and said, 'You stay. You have questions to answer.'" Raquel Depo. at 59:10–11. Rito asked to stay with his wife, but Wynar said "No." *Id.* at 59:13–16.

Wynar then took Raquel to another room where Wynar and Raquel were alone. *Id.* at 68:5–7. Raquel testified that Wynar "brought me to the other office and he grabbed two chairs, and he instructed me to sit in one of them and he sat in the other one." *Id.* at 68:7–9. Raquel and Wynar had a conversation in that room for between thirty minutes and one hour. *Id.* at 68:12–13.

At some point after Rito had been released, Larry Brown called Raquel's phone, which Rito had acquired. Rito then went back into the Life Savers office and handed the phone to Raquel while she was being questioned. *Id.* at 62:3–9. Raquel subsequently called her attorney on the phone and Wynar spoke with her attorney. Raquel's attorney then told her "Raquel, you may leave. You don't have to stay there anymore. He can't hold you there." *Id.* at 73:12–14. Raquel then left the Life Savers office and walked outside. Wynar followed Raquel outside, where he had a conversation with Raquel and Rito. *Id.* at 73:15–74:8. The FBI agents continued their search of the Life Savers office and departed between approximately 1:00 p.m. and 1:30 p.m. *Id.* at 77:5–7.

## B. Procedural Background

On April 15, 2018, Plaintiffs filed an initial complaint. ECF No. 1. In addition to Wynar, Plaintiffs' complaint stated causes of action against Alicia Cox (an investigator for the Office of the Monterey County District Attorney) and the FBI. *Id.* Further, the complaint included Life Savers itself as a plaintiff. *Id.* On August 27, 2018, the FBI filed a motion to dismiss the complaint. ECF No. 24. On October 12, 2018, Wynar also filed a motion to dismiss the complaint. ECF No. 36. The Court held a case management conference on October 17, 2018, and at the conference, Plaintiffs moved to dismiss Alicia Cox without prejudice. ECF No. 40. The

5

1    Court granted Plaintiffs' motion to dismiss Alicia Cox. ECF No. 41.

2         On October 17, 2018, the Court ordered Plaintiffs to either oppose the motions to dismiss

3    filed by Wynar and the FBI or amend Plaintiffs' complaint by November 13, 2018. *Id.* On

4    November 16, 2018, Wynar and the FBI filed a joint reply brief that noted that Plaintiffs had failed

5    to either oppose the motions to dismiss or amend the complaint by the Court's November 13, 2018

6    deadline. ECF No. 42. Later that same day, the parties filed a stipulation to extend the deadline

7    for Plaintiffs to file an amended complaint to November 16, 2018. ECF No. 43. The Court

8    granted the stipulation. ECF No. 45.

9         Thus, on November 16, 2018, Plaintiffs filed a first amended complaint. ECF No. 44

10   ("FAC"). In the FAC, Plaintiffs no longer named the FBI as a defendant, which left Wynar and

11   the unidentified Doe individuals as the only defendants. FAC at ¶¶ 11–16.

12        On December 6, 2018, Wynar filed a motion to dismiss the FAC. ECF No. 47. On

13   January 7, 2019, Plaintiffs filed an opposition. ECF No. 53. On February 12, 2019, Wynar filed a

14   reply. ECF No. 59.

15        On May 16, 2019, the Court granted in part and denied in part the motion to dismiss the

16   FAC. ECF No. 67. The Court dismissed all of Life Savers' claims with prejudice. *Id.* at 7–8, 12.

17   The Court also dismissed with prejudice Plaintiffs' official capacity claims and Plaintiffs'

18   Fourteenth Amendment claims. *Id.* at 7–8. The Court then analyzed Plaintiffs' *Bivens* claims.

19   The Court dismissed without prejudice Plaintiffs' First Amendment and Fifth Amendment *Bivens*

20   claims. *Id.* at 14–15. The Court also dismissed without prejudice the Fourth Amendment *Bivens*

21   claims of Rito, Lupita, and Esequiel. *Id.* at 17. By contrast, the Court denied without prejudice

22   the motion to dismiss Raquel's Fourth Amendment *Bivens* claim. *Id.*

23        On June 17, 2019, Plaintiffs filed a second amended complaint ("SAC"). ECF No. 70. In

24   the SAC, Plaintiffs alleged Fourth Amendment and Fifth Amendment *Bivens* claims against

25   Wynar. *Id.* at ¶¶ 85–149. On July 15, 2019, Wynar filed a motion to dismiss the SAC. ECF No.

26   73. On August 15, 2019, Plaintiffs filed an opposition. ECF No. 76. On August 29, 2019, Wynar

27

6

28

filed a reply.  ECF No. 79.

On November 8, 2019, the Court granted with prejudice in part and denied in part the motion to dismiss the second amended complaint.  ECF No. 84.  The Court dismissed with prejudice Plaintiffs' Fifth Amendment *Bivens* claims.  *Id.* at 25.  The Court dismissed with prejudice Rito and Esequiel's Fourth Amendment *Bivens* claims to the extent those claims were based on the theory that handcuffing Rito and Esequiel during the *Summers*-type detention amounted to excessive force.  *Id.* at 26.  The Court denied without prejudice the motion to dismiss Rito and Esequiel's Fourth Amendment *Bivens* claims to the extent those claims were based on the theory that pointing a gun at Rito and Esequiel during the *Summers*-type detention amounted to excessive force.  *Id.*  The Court denied without prejudice the motion to dismiss Rito and Esequiel's Fourth Amendment *Bivens* claims to the extent those claims were based on the theory that the prolonged questioning of Rito and Esequiel constituted unreasonable detention.  *Id.*  The Court dismissed with prejudice Lupita's Fourth Amendment *Bivens* claim to the extent it was based on the theory that temporarily denying Luptia access to her shoes and clothing during the *Summers*-type detention amounted to unreasonable detention.  *Id.*  Finally, the Court denied without prejudice the motion to dismiss Lupita's Fourth Amendment *Bivens* claim to the extent that claim was based on the theory that temporarily denying Lupita access to her cell phone during the *Summers*-type detention amounted to unreasonable detention.  *Id.*  Thus, the only claims in Plaintiffs' second amended complaint that survived the two motions to dismiss are four Fourth Amendment *Bivens* claims against Wynar.

On January 25, 2021, Wynar filed a motion for summary judgment.  ECF No. 110 ("Mot.").  On February 19, 2021, Plaintiffs filed an opposition.  ECF No. 118 ("Opp.").  On March 2, 2021, Wynar filed a reply.  ECF No. 119 ("Reply").

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## III.    DISCUSSION

The only claims that have survived the two motions to dismiss are Plaintiffs' following four claims against Defendant Roahn Wynar ("Defendant"). First, Plaintiffs assert a Fourth Amendment *Bivens* claim against Defendant for unreasonably detaining Raquel. SAC at ¶ 86. Second, Plaintiffs assert a Fourth Amendment *Bivens* claim against Defendant on the theory that denying Lupita access to her cell phone during the *Summers*-type detention amounted to unreasonable detention. *Id.* at ¶ 49. Third, Plaintiffs assert a Fourth Amendment *Bivens* claim against Defendant on the theory that the prolonged questioning of Rito and Esequiel constituted unreasonable detention. *Id.* at ¶¶ 47–54, 86. Fourth, Plaintiffs assert a Fourth Amendment *Bivens* claim against Defendant on the theory that pointing a gun at Rito and Esequiel during the

*Summers*-type detention amounted to excessive force. *Id.* at ¶ 92–93.

The United States Supreme Court has recognized that an implied cause of action may be available to plaintiffs who would otherwise have no statutory redress against federal officials who violated plaintiffs' constitutional rights. In *Bivens*, the United States Supreme Court found that "'violation of [the Fourth Amendment] by a federal agent . . . g[ave] rise to a cause of action for damages' against a Federal Government employee." *Minneci v. Pollard*, 565 U.S. 118, 120 (2012) (quoting *Bivens v. Six Unknown fed. Narcotics Agents*, 403 U.S. 388, 389 (1971)). In making this finding, the United States Supreme Court "created a remedy for violations of constitutional rights committed by federal officials acting in their individual capacities." *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007). The United States Supreme Court has recognized that this "freestanding damages remedy for a claimed constitutional violation" is far from automatic. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

Rather, the United States Supreme Court has recognized implied *Bivens* causes of action for damages against federal employees for only three types of constitutional violations: (1) police search and seizure in violation of the Fourth Amendment, *see Bivens*, 403 U.S. 388; (2) gender discrimination by a Congressman in violation of the Fifth Amendment for an employee not covered by Title VII, *see Davis v. Passman*, 442 U.S. 228 (1979); and (3) deliberate indifference toward a prisoner in violation of the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14 (1980); *see also Minneci*, 565 U.S. at 124–25. In each of these cases, the United States Supreme Court allowed a *Bivens* remedy because the United States Supreme Court found that the plaintiffs had no other meaningful remedies for the constitutional violations they had suffered. *Id.* "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the [United States Supreme] Court has approved of an implied damages remedy under the Constitution itself." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017).

Defendant argues that he is entitled to summary judgment in his favor on Plaintiffs' four

United States District Court
Northern District of California

Fourth Amendment *Bivens* claims because Defendant did not violate any of Plaintiffs' constitutional rights. Defendant further argues that he is entitled to qualified immunity on each of the claims. Plaintiffs argue that material factual disputes between the parties mean that summary judgment in Defendant's favor is inappropriate.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine whether a government official is entitled to qualified immunity, we ask two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly established at the time of the challenged conduct." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013). The Court may exercise its discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

The Court addresses Defendant's arguments in favor of summary judgment in turn.

### A. Raquel's Fourth Amendment *Bivens* Claim for Unreasonable Detention

Plaintiffs first allege that Defendant violated Raquel's Fourth Amendment rights by unreasonably detaining and interrogating Raquel. SAC at ¶ 86. Defendant argues that he is entitled to summary judgment because no reasonable jury could find that he subjected Raquel to a forced interrogation. Mot. at 23. Defendant further argues that he is entitled to qualified immunity. Below, the Court considers (1) whether the alleged misconduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.

#### 1. Whether there has been a Violation of a Constitutional Right

In *Michigan v. Summers*, the United States Supreme Court established that law enforcement may detain a building's occupants while officers execute a search warrant as long as

10

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

the detention itself is reasonable. *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981); *see also Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006) (same). The Ninth Circuit has interpreted the United States Supreme Court's subsequent decision in *Muehler v. Mena* to "mean that the duration of a detention may be coextensive with the period of a search, and require no further justification." *Dawson*, 435 F.3d at 1066 (citing *Muehler v. Mena*, 544 U.S. 93 (2005)). However, the detention itself must be conducted "in a reasonable manner." *Id.*

In *Ganwich v. Knapp*, the Ninth Circuit held that a forced interrogation during a *Summers*-type detention is unreasonable and therefore unlawful under the Fourth Amendment. *Ganwich v. Knapp*, 319 F.3d 1115, 1121 (9th Cir. 2003). In *Ganwich*, "the officers told the plaintiffs, who already had been detained for more than an hour, that they would not be released until they submitted to individual interrogation. The officers then brought each plaintiff to a back room, where officers interrogated him or her." *Id.* The *Ganwich* court held that although the government may have an interest in such questioning, "it is not so important as to outweigh the plaintiffs' privacy rights, which the coerced interrogations severely invaded." *Id.*

The *Ganwich* court noted that the detention was unreasonable for the further reason that the officers prevented "the plaintiffs from making a telephone call for extended times during the detention." *Id.* at 1123. The court explained that "holding plaintiffs incommunicado" was a restriction on their privacy interests that was not "carefully tailored to its underlying justification." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983). The court therefore held that the officers had restricted plaintiffs' Fourth Amendment rights by "detaining them incommunicado," and "using threat of continued detention to coerce them to submit to interrogations." *Ganwich*, 319 F.3d at 1117.

Here, Defendant argues that his conduct did not violate Raquel's Fourth Amendment rights. Defendant portrays the facts as follows. After Rito, Lupita, and Esequiel were told they were free to leave the Life Savers office, Defendant told Raquel that he wanted to ask her questions about Life Savers, but that "the interview was totally voluntary." Wynar Depo. at

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

202:17–21; Kay Decl. at ¶ 25. Defendant therefore asked "if [Raquel] would be willing to interview with us. And she affirmatively said she was willing." *Id.* Defendant, Agent Kay, and Agent Lee then interviewed Raquel. Lee Decl. at ¶ 8; Wynar Depo. at 312:19–21. Raquel eventually decided that she wanted to talk to an attorney, and after Raquel invoked her right to counsel, Defendant stopped questioning her and Raquel voluntarily left the Life Savers office. Wynar Depo. at 151:4–16; Kay Decl. at ¶¶ 27–30.

In light of this portrayal of the facts, Defendant argues that he did not subject Raquel to a forced interrogation for five reasons. Mot. at 23–24. First, Defendant argues that the record establishes that Raquel voluntarily interviewed with law enforcement. Second, Defendant argues that he stopped his interview with Raquel after Raquel invoked her right to counsel. Third, Defendant argues that unlike in *Ganwich*, Raquel was detained for only a short period of time, rather than for hours as in *Ganwich*. Fourth, Defendant argues that a *Summers*-type "detention may be coextensive with the period of a search, and require no further justification." Mot. at 24 (quoting *Dawson*, 435 F.3d at 1066). Finally, Defendant argues that Raquel was not detained "incommunicado," and Rito was free to bring her a cell phone. *Id.* at 24. Accordingly, Defendant argues that he did not violate Raquel's Fourth Amendment rights because Raquel voluntarily interviewed with the FBI agents and Defendant did not detain Raquel after she wanted to speak with counsel. Mot. at 25.

Plaintiffs dispute Defendant's portrayal of events, and portray the facts as follows. After Defendant told Rito, Lupita, and Esequiel that they were free to leave, Raquel was told by Defendant that she had to stay and answer questions. Raquel testified that Defendant "looked at me and said, 'You stay. You have questions to answer.'" Raquel Depo. at 59:10–12; *see also* Esequiel Depo. at 64:15–16 ("And then I asked if Raquel could go and they said, 'No. She needs to stay.'"). Rito testified that he "asked [Defendant] whether I could stay, and he said no, that only Raquel." Rito Depo. at 54:24–25.

Raquel testified that Defendant then "brought me to the other office and he grabbed two

chairs, and he instructed me to sit in one of them and he sat in the other one." Raquel Depo. at 68:7–9. Raquel testified that there was no one else with them in the room, and Defendant asked her questions for approximately thirty minutes to one hour. *Id.* at 68:5–13. Raquel further testified that Rito then came into the Life Savers office with Raquel's cell phone because Larry Brown had called Raquel's phone. *Id.* at 62:3–63:25. Raquel spoke to Larry Brown and then Raquel called her attorney, who spoke with Defendant. Raquel's attorney then told Raquel: "[Y]ou may leave. You don't have to stay there anymore. He can't hold you there." *Id.* at 73:13–14. Raquel then left the Life Savers office. *Id.* at 73:15.

Plaintiffs challenge each of Defendant's arguments for summary judgment. Opp. at 6–10. Plaintiffs first argue that Plaintiffs' testimony demonstrates that Raquel's interrogation was not voluntary, but rather Raquel was forced to stay and submit to questioning by Defendant before she was allowed to leave. Plaintiffs next argue that Raquel's subsequent discussion with her attorney does not excuse the fact that she was subject to a forced interrogation and held incommunicado before she was able to contact her attorney. Third, Plaintiffs argue that Raquel was detained for a sufficient period of time to qualify as an unreasonable detention under *Ganwich*, especially given that Raquel had already provided the agents with the keys to open all rooms and closets in the office and explained where everything was in the office. *See* Raquel Depo. at 98:9. Fourth, Plaintiffs argue that Raquel was detained past the point when any proper search of the office ended. Fifth, Plaintiffs argue that Raquel was unreasonably detained incommunicado prior to Rito bringing Raquel's phone to her after Larry Brown called. Raquel testified that Defendant first instructed Plaintiffs not to use their phones when Plaintiffs were gathered in the lobby. *Id.* at 57:24–25. Plaintiff was therefore detained without the ability to contact an attorney for an extended period of time.

Taken together, Plaintiffs argue that the record demonstrates that Defendant subjected Raquel to a forced interrogation and unreasonable detention in violation of Raquel's Fourth Amendment rights under *Ganwich*. Mot. at 6. According to Plaintiffs, Defendant forced Raquel

to undergo a lengthy detention and forced interrogation before she could leave and Defendant held her incommunicado for an extended period of time before she was allowed to contact her attorney, at which point Defendant finally allowed Raquel to depart.

Based on the totality of the circumstances, the Court concludes that there is a genuine dispute of material fact as to whether (1) Raquel voluntarily consented to further questioning by Defendant or whether she was ordered to stay and answer questions before she could depart; (2) the length of time that Raquel was detained after the other Plaintiffs were released; and (3) whether Raquel was held incommunicado during her further detention. As a result, there is a genuine dispute of material fact as to whether Defendant detained Raquel incommunicado and used the threat of continued detention to coerce Raquel to submit to an interrogation, and in turn, whether Defendant's conduct violated Raquel's Fourth Amendment rights as a matter of law. *See Ganwich*, 319 F.3d at 1117–18 (holding that summary judgment was inappropriate where plaintiffs were subject to forced interrogations and held incommunicado).

Having found a genuine dispute of material fact as to the first question in the qualified immunity analysis, the Court now turns to the second question in the qualified immunity analysis.

### 2. Whether the Right was Clearly Established at the Time of the Alleged Misconduct

As for the second question in the qualified immunity analysis, officers are entitled to qualified immunity where their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation omitted). For a constitutional right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). To do so, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12.

Defendant argues that he is entitled to qualified immunity because "[a] reasonable agent would not have known that it was not permissible to conduct a voluntary interview." Mot. at 25. Plaintiffs argue that Defendant's conduct was clearly unconstitutional in light of the Ninth

14

Circuit's decision in *Ganwich*, which prohibited holding plaintiffs incommunicado and using their continued detention to coerce them into submitting to an interrogation. *See Ganwich v. Knapp*, 319 F.3d at 1117.

Here, the Court cannot resolve the parties' dispute as to whether Defendant's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. This is because both parties' arguments depend on whether or not Raquel consented to further questioning; the length of her further detention; and whether Raquel was held incommunicado for an extended period of time during her detention. The Court has already found a genuine material dispute as to those facts. Accordingly, the Court concludes there is a genuine material dispute as to the second question in the qualified immunity analysis.

In sum, the Court finds there is a genuine dispute of material fact as to whether Defendant violated Raquel's Fourth Amendment rights as a matter of law and whether Defendant's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. Thus, at summary judgment, the Court cannot conclude that Defendant is entitled to qualified immunity. Accordingly, the Court DENIES Defendant's motion for summary judgment as to Raquel's unreasonable detention claim.

**B. Lupita's Fourth Amendment *Bivens* Claim for Unreasonable Detention**

Plaintiffs' second Fourth Amendment *Bivens* claim alleges that Defendant violated Lupita's Fourth Amendment rights by unlawfully depriving her of use of her cell phone during the *Summers*-type detention. SAC at ¶¶ 49, 102. Defendant argues that he did not unreasonably detain Lupita by briefly prohibiting the use of her cell phone and that the Court should grant summary judgment because the evidence contradicts Plaintiffs' theory. Mot. at 20. Defendant further argues that he is entitled to qualified immunity. Below, the Court considers (1) whether the alleged misconduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.

**1. Whether there has been a Violation of a Constitutional Right**

United States District Court
Northern District of California

In *Ganwich*, the Ninth Circuit held that during a *Summers*-type detention, "preventing the plaintiffs from making a telephone call for extended times during the detention" may violate the Fourth Amendment. *Ganwich v. Knapp*, 319 F.3d at 1123. The *Ganwich* court explained that "officers may prevent temporary detainees from using a telephone only so long as that restriction is 'carefully tailored to its underlying justification.'" *Id.* (quoting *Royer*, 460 U.S. at 500). If an officer unjustifiably deprives a detainee of telephone access during a *Summers*-type detention, the officer violates the Fourth Amendment. *Id.*

Defendant first argues that Lupita was not permitted to use her cell phone for only a brief period. Defendant portrays the record as establishing that agents arrived at the Life Savers offices at approximately 10:00 a.m., and that Lupita left the premises by 10:20 a.m. Wynar Depo. at 143:8–10; Taylor Decl. at ¶ 22. Defendant argues that the record further establishes that Defendant spoke to Lupita regarding her cell phone use at the end of the period when Esequiel, Lupita, and Rito were in the Life Savers offices. Mot. at 21. Thus, according to Defendant, Lupita was denied use of her cell phone for only "a fraction of a twenty-minute time period." Mot. at 21.

Furthermore, Defendant argues that he had "carefully tailored" reasons to restrict Lupita's cell phone use. Mot. at 22. Specifically, Defendant argues that he was justified in preventing Lupita from using her cell phone because (1) Defendant was focused on allowing the Plaintiffs to leave, and a cell phone call would have hindered that process; (2) it would be disruptive to the search to allow Lupita to linger on the premises to make a cell phone call; (3) the FBI agents had concerns regarding their safety due to outside communication; (4) the FBI agents did not want subjects to be notified unnecessarily and it is good practice to prevent cell phone use until agents have complete control of a scene. Mot. at 22.

Plaintiffs first dispute Defendant's characterization of the record. Plaintiffs argue that the four Plaintiffs were held in the lobby for thirty to forty minutes. Esequiel Depo. at 62:12–15 ("He kept asking her questions. After the 30 to 40 minutes, he got me up and then he took – Lupita said

16

'Are we under arrest?'"). Plaintiffs testified that Defendant instructed Plaintiffs not to use their phones soon after they were moved into the lobby. Raquel Depo. at 57:11–58:1 (testifying that Defendant instructed Plaintiffs that they "cannot use any phones," and then Defendant "ordered Lupita, Esequiel, and Rito to show their IDs."). Plaintiffs therefore argue that there is a dispute of material fact as to the length of Lupita's deprivation of cell phone use. Opp. at 10.

Moreover, Plaintiffs argue that Defendant has failed to establish that Lupita's deprivation was "carefully tailored to its underlying justification," *Ganwich*, 319 F.3d at 1123, and that "[o]nce the four plaintiffs were assembled in the lobby, there was no reason to prevent any of them from using their phones." Opp. at 10. Plaintiffs argue that law enforcement had completely secured the scene and had handcuffed Rito and Esequiel. *Id.* at 11. Furthermore, Plaintiffs argue that there is no evidence in the record that there were simultaneous searches elsewhere, and so Defendant had no reason to worry that a call might alert others before a simultaneous search could be carried out. *Id.*

There is a genuine dispute of material fact as to the length of time that Lupita was deprived of her cell phone. The Court therefore concludes that there is a genuine dispute of material fact as to whether Defendant violated Lupita's Fourth Amendment rights by depriving her of use of her cell phone during a *Summers*-type detention.

**2. Whether the Right was Clearly Established at the Time of the Alleged Misconduct**

As for the second question in the qualified immunity analysis, officers are entitled to qualified immunity where their conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation omitted). For a constitutional right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix*, 577 U.S. at 11. To do so, the "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12.

Defendant argues that he "did not violate clearly established law regarding Lupita's cell

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

phone claim, because *Ganwich* does not prohibit a brief cessation of phone use." Mot. at 25. However, the *Ganwich* court did not impose a bright line rule for the length of time a detainee could be restricted from using a cell phone. Rather, the *Ganwich* court held that such a restriction could last "only so long as that restriction is carefully tailored to its underlying justification.'" 319 F.3d at 1123 (quoting *Royer*, 460 U.S. at 500). Plaintiffs therefore argue that Defendant's conduct clearly violated Lupita's Fourth Amendment rights because the deprivation was not brief and was not "carefully tailored" to the circumstances of the search. Opp. at 10, 14 (quoting *Ganwich*, 319 F.3d at 1123).

Here, the Court cannot resolve the parties' dispute as to whether Defendant's conduct violated a clearly established constitutional right of which a reasonable person would have known. This is because the parties' argument depends in large part on the length of the deprivation of cell phone use, and the Court has already found a genuine material dispute as to that fact. Accordingly, the Court concludes there is a genuine material dispute as to this second question in the qualified immunity analysis. Thus, at summary judgment, the Court cannot conclude that Defendant is entitled to qualified immunity on Lupita's Fourth Amendment *Bivens* claim for unreasonable detention.

The Court therefore DENIES Defendant's motion for summary judgment as to Plaintiffs' claim that Defendant violated Lupita's Fourth Amendment right by depriving her of use of her cell phone during a *Summers*-type detention.

**C. Rito and Esequiel's Fourth Amendment *Bivens* Claim for Unreasonable Detention**

Plaintiffs' third Fourth Amendment *Bivens* claim alleges that Defendant violated Rito and Esequiel's Fourth Amendment rights by detaining Rito and Esequiel for an unreasonably prolonged period of time and therefore detaining them in an unreasonable manner. SAC at ¶¶ 47–54, 86. Defendant argues that he did not unreasonably detain Rito and Esequiel because the record directly contradicts Plaintiffs' claims. Mot. at 13. Defendant further argues that he is entitled to qualified immunity. Below, the Court considers (1) whether the alleged misconduct violated a

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.

### 1. Whether there has been a Violation of a Constitutional Right

In *Michigan v. Summers*, 452 U.S. 692, the United States Supreme Court held that a warrant to search a location "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705. Moreover, "the duration of a detention may be coextensive with the period of a search, and require no further justification." *Dawson*, 435 F.3d at 1066. "An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler*, 544 U.S. at 98 (internal quotation marks omitted). Thus, in a *Summers*-type detention, an officer need not "have particular suspicion that an individual is involved in criminal activity or poses a specific danger." *Bailey*, 568 U.S. at 193. Furthermore, an officer may "generally ask questions of [an] individual," including "to examine the individual's identification" and "request consent to search his or her luggage." *Muehler*, 544 U.S. at 101. However, an officer still must "conduct[] the detention in a reasonable manner" in order for the detention to pass constitutional muster. *Dawson*, 435 F.3d at 1066.

Defendant argues that Rito and Esequiel were released long before the FBI finished its search of the Live Savers office. Defendant argues that the record establishes that Rito, Esequiel, and Lupita were released by 10:20 a.m., and that the FBI agents did not complete their search until between 1:00 p.m. and 1:30 p.m. *See* Raquel Depo. at 77:5–7 ("Q: To the best of your knowledge, law enforcement left around 1:00 p.m.? A. I will say – let's say between 1:00 and 1:30."); Kay Decl. at ¶ 24. Furthermore, Defendant argues that Rito and Esequiel were asked only basic biographical questions and questions related to safety. Esequiel testified that "[a]fter he uncuffed me, [Defendant] said he needed to see my ID. I told him it was in my backpack. And then he said, 'Do you have any sharp objects on you?' And then he proceeded to check my backpack for

any sharps, stuff like that." Esequiel Depo. at 64:4–8.[2] Rito testified that "[a]fter they had – after they had asked for our IDs, then it was that they told us that we could go." Rito Depo. at 104:3–4. Defendant argues that Defendant's actions were precisely of the kind that the United States Supreme Court and Ninth Circuit have found lawful in *Summers* and its progeny. *See Michigan v. Summers*, 452 U.S. at 705 (holding that a warrant to search a location "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."); *see also Dawson*, 435 F.3d at 1066 (holding that "the duration of a detention may be coextensive with the period of a search, and require no further justification.").

Plaintiffs argue that Defendant violated "[t]he right of Rito and Esequiel to be free from an unreasonably prolonged period of detention." Opp. at 15. Plaintiffs further argue that "[o]nce it was determined that neither [Rito or Esequiel] had a weapon or posed any risk and they had provided identification, they should have been released. They were not." *Id.*

Plaintiffs' argument lacks merit for two reasons. First, Plaintiffs' argument is contradicted by Plaintiffs' own testimony. Rito testified that "[a]fter they had – after they had asked for our IDs, then it was that they told us that we could go." Rito Depo. at 104:3–4. Esequiel testified that "[a]fter he uncuffed me, [Defendant] said he needed to see my ID. I told him it was in my backpack. . . . He searched my backpack. After that, he said, 'Okay. You are free to go.' And then I showed him my paper ID and that was it." Esequiel Depo. at 64:4–10. Thus, Rito and Esequiel's own testimony contradicts Plaintiffs' argument that Rito and Esequiel were detained after Defendant asked for Rito and Esequiel's IDs and determined that they were not a security risk. Furthermore, although Plaintiffs argue that the search was likely over by the time Defendant questioned Raquel, Raquel's own testimony establishes that law enforcement was still "loading up their dollies with cardboard boxes" when Raquel returned to the office after 1:00 p.m. Raquel Depo. at 74:19–21.

---

[2] Plaintiffs do not challenge Defendant's search of Esequiel's backpack. *See* ECF No. 84; Opp. at 13.

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Second, Plaintiffs' argument contradicts established law. As the Ninth Circuit has made clear, "the duration of a detention may be coextensive with the period of a search, and require no further justification." *Dawson*, 435 F.3d at 1066. Plaintiffs argue that "[Defendant] unreasonably detained plaintiffs Rito and Esequiel when there was no need to do so, thus resulting in unreasonable detention." Opp. at 13. However, that is not the law. The United States Supreme Court and Ninth Circuit have made clear that occupants may be detained for the duration of a search. *See Summers*, 452 U.S. at 705 (holding that a warrant to search a location "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."); *Dawson*, 435 F.3d at 1066 ("[T]he duration of a detention may be coextensive with the period of a search, and require no further justification.").

Although Plaintiffs appear to argue otherwise, the record makes clear that Rito and Esequiel were released from detention before the FBI's search of the Life Savers office had concluded. Specifically, the record establishes that Rito, Esequiel, and Lupita were released by approximately 10:20 a.m., and that the FBI did not complete its search until between 1:00 p.m. and 1:30 p.m. *See* Raquel Depo. at 77:5–7; Kay Decl. at ¶ 24. Thus, Rito and Esequiel were released long before the search concluded. Defendant's conduct was therefore clearly lawful under *Summers*, 452 U.S. at 705, and *Dawson*, 435 F.3d at 1066. Moreover, Plaintiffs have not identified any other basis for concluding that Defendant's detention of Rito and Esequiel was unreasonable or unlawful.

In sum, Plaintiffs provide no evidence from which it can be inferred that Defendant failed to "conduct[] the detention [of Rito and Esequiel] in a reasonable manner." *Dawson*, 435 F.3d at 1066. Accordingly, Defendant's motion for summary judgment on Plaintiffs' unreasonable detention claim as to Rito and Esequiel is GRANTED. The Court thus finds it unnecessary to address Defendant's alternative argument that Defendant is entitled to qualified immunity.

### D. Rito and Esequiel's Fourth Amendment *Bivens* Claim for Excessive Force

Plaintiffs' final Fourth Amendment *Bivens* claim alleges that Defendant violated Rito and

21

Esequiel's Fourth Amendment rights by pointing a gun at them after they were handcuffed and therefore using excessive force while detaining Rito and Esequiel. SAC at ¶¶ 35, 92, 93.

In *Michigan v. Summers*, the United States Supreme Court established that law enforcement may detain a building's occupants while officers execute a search warrant as long as the detention itself is reasonable. 452 U.S. at 704–05. Moreover, "[i]nherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98. "An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* (internal quotation marks omitted). Thus, in a *Summers*-type detention, an officer need not "have particular suspicion that an individual is involved in criminal activity or poses a specific danger." *Bailey*, 568 U.S. at 193.

Where a plaintiff challenges the force used to effectuate a detention, the Court asks whether that force was "'objectively reasonable' in light of the facts and circumstances confronting the officer." *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2002) (en banc). This determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

In the instant case, the FBI searched the Life Savers offices pursuant to a search warrant, and Rito and Esequiel were detained in connection with the search. Lee Decl. at ¶ 3; Taylor Decl. at ¶ 6. Defendant therefore possessed "categorical" authority to detain Rito and Esequiel incident to the search. *Muehler*, 544 U.S. at 98. Further, "[i]nherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* at 99. Accordingly, the question before the Court is whether the record in this case established that Defendant's conduct was reasonable in the context of a *Summers*-type detention

Defendant argues that the record in this case firmly establishes that Defendant did not

point a gun at Rito or Esequiel after they were handcuffed, and that Defendant did not order any other agent to point a gun at Rito or Esequiel after they were handcuffed. Mot. at 14–15.

The Court agrees. None of the Plaintiffs testified that Defendant pointed a gun at Rito or Esequiel. Lupita was asked "Did you see [Defendant] point any weapon at any plaintiff?" Lupita replied "No." Lupita Depo. at 137:1–4. Rito testified that a group of agents pointed their weapons at him while Defendant was handcuffing him, but Rito did not testify that Defendant pointed a weapon at him. Rito Depo. at 44:24–45:2. Thus, there is no evidence in the record that Defendant pointed a gun at Rito or Esequiel while or after they were handcuffed. Moreover, there is no evidence in the record that Defendant ordered any agent to point a weapon at Rito or Esequiel. While testifying, Lupita was asked if she heard Defendant order any agent to point a weapon at any plaintiff. Lupita answered "No." Lupita Depo. at 137:3–7.

In opposition, Plaintiffs do not argue that Defendant pointed a weapon at Rito or Esequiel or instructed any agent to point a weapon at Rito or Esequiel. Rather, Plaintiffs now argue that Defendant used excessive force in violation of Rito and Esequiel's Fourth Amendment rights by handcuffing Rito and Esequiel while they had guns pointed at them. Opp. at 4–5.

Plaintiffs' argument lacks merit for two reasons. First, the conduct that Plaintiffs challenge—Defendant's act of handcuffing Rito and Esequiel while Rito and Esequiel had weapons pointed at them—has been upheld as lawful by the United States Supreme Court. In *Muehler*, in the course of a *Summers*-type detention, a SWAT team woke the plaintiff from her bed and, at gunpoint, placed her in handcuffs for two to three hours. *Muehler*, 544 U.S. at 96; *see also Dawson*, 435 F.3d at 1058 (same). The United States Supreme Court held that this treatment represented only a "marginal intrusion," which was outweighed by the government's countervailing interest in safety needed to execute the warrant. *Id.* at 99. Accordingly, the United States Supreme Court explained that the agents in *Muehler* used reasonable force to effectuate the detention and upheld the detention as "plainly permissible" under the Fourth Amendment. *Id.* at 95, 98.

Here, Plaintiffs challenge conduct far less intrusive than in *Muehler*. Viewing the evidence in the light most favorable to the nonmoving party, Rito and Esequiel were placed in handcuffs at gunpoint, and detained in handcuffs for at most thirty to forty minutes, which is far less than the two to three hours that the United States Supreme Court upheld in *Muehler*. *See* Esequiel Depo. at 62:13–14 (stating that Esequiel was held in the lobby in handcuffs for "30 to 40 minutes"). Defendant's conduct was therefore lawful under the United States Supreme Court's decision in *Muehler*. *Muehler*, 544 U.S. at 96.

Moreover, based on the same legal futility, the Court already dismissed with prejudice essentially the same claim in the Court's November 11, 2019 order granting in part and denying in part Defendant's motion to dismiss. ECF No. 84. Specifically, the Court dismissed with prejudice Plaintiffs' Fourth Amendment *Bivens* claim based on the theory that Defendant's act of handcuffing Rito and Esequiel during the *Summers*-type detention amounted to excessive force. *Id.* at 12–13. The Court explained that Plaintiffs had not pled facts sufficient to state a claim for a Fourth Amendment violation. *Id.* The Court further explained that in *Muehler*, in the course of a *Summers*-type detention, the police roused a detainee from bed and, at gunpoint, placed the detainee in handcuffs for two to three hours. *Muehler*, 544 U.S. at 96. Guided by *Muehler*, this Court dismissed Plaintiffs' claim with prejudice after Plaintiffs failed to adequately amend their claim that Defendant's handcuffing of Rito and Esequiel violated Plaintiffs' Fourth Amendment rights. ECF No. 84, at 12–13. Plaintiffs now appear to be reviving the same legally futile claim that the Court dismissed with prejudice, without leave from the Court to do so.

Accordingly, Defendant is entitled to summary judgment on Plaintiffs' claim that Defendant violated Rito and Esequiel's Fourth Amendment rights by handcuffing them while other agents pointed weapons at Rito and Esequiel.

Finally, although Plaintiffs' opposition brief is somewhat unclear, Plaintiffs appear to suggest that Defendant is also liable under a theory of supervisory liability because other agents pointed their guns at Rito and Esequiel after Defendant had handcuffed both Plaintiffs. Opp. at

11.  However, Plaintiffs' argument lacks merit because Plaintiffs' second amended complaint does not allege that Defendant is liable for violating Plaintiffs' Fourth Amendment rights based on a theory of supervisory liability.  Plaintiffs may not raise a new claim or theory of liability for the first time in response to a motion for summary judgment.  *Ziptronix, Inc. v. Omnivision Techs., Inc.*, 71 F. Supp. 3d 1090, 1099 (N.D. Cal. 2014) (explaining that "[a] plaintiff cannot raise a claim for the first time in response to a motion for summary judgment," and therefore plaintiff could not allege a new theory of liability in its response brief).  Furthermore, the United States Supreme Court has disallowed *Bivens* actions against supervisors for the "unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  A supervisor therefore cannot be liable unless through his "own individual actions, [he] has violated the Constitution."  *Id.*

In sum, Plaintiffs have failed to set forth any "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), because Plaintiffs fail to cite any evidence that Defendant used excessive force in detaining Rito and Esequiel.  Because Plaintiffs fail to cite any evidence demonstrating that Defendant violated Rito and Esequiel's Fourth Amendment rights, the Court GRANTS Defendant's motion for summary judgment on Plaintiffs' Fourth Amendment excessive force claim against Defendant.  The Court thus finds it unnecessary to address Defendant's alternative argument that Defendant is entitled to qualified immunity.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to Rito and Esequiel's Fourth Amendment *Bivens* claim for excessive force and Rito and Esequiel's Fourth Amendment *Bivens* claim for unreasonable detention.  Defendant's motion for summary judgment is DENIED as to Raquel's Fourth Amendment *Bivens* claim for unreasonable detention and Lupita's Fourth Amendment *Bivens* claim for unreasonable detention.

**IT IS SO ORDERED.**

Dated: April 28, 2021

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Lucy H. Koh

LUCY H. KOH
United States District Judge

Case No. 18-CV-02252-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT